In re the Marriage of:

Tony K. Steinmann,
Petitioner-Respondent,

v.

Rose M. Steinmann,
Respondent-Appellant-Petitioner.

Supreme Court

*No. 2005AP1588. Oral argument October 4, 2007.
—Decided May 23, 2008.*

2008 WI 43

(Also reported in 749 N.W.2d 145.)

30

32

34

Ziegler, J., took no part.

For the respondent-appellant-petitioner there were briefs by *Daniel W. Hildebrand, Megan A. Senatori,* and *DeWitt Ross & Stevens, S.C.,* Madison; and *Raymond E. Krek* and *Krek & Associates, S.C.,* Jefferson, and oral argument by *Megan A. Senatori.*

For the petitioner-respondent there was a brief by *Richard E. Reilly, Kathryn A. Keppel*, and *Gimbel, Reilly, Guerin & Brown,* Milwaukee, and oral argument by *Richard E. Reilly.*

¶ 1. LOUIS B. BUTLER, JR., J. This is a review of an unpublished court of appeals opinion[1] affirming a circuit court decision for Walworth County by the Honorable Michael S. Gibbs that awarded maintenance from Rose Steinmann (Rose) to Tony Steinmann (Tony) and divided the Steinmanns' property in a divorce proceeding. Rose challenges the circuit court's property division, which she argues included a flawed "double-counting" of assets; improper application of transmutation rather than tracing principles; and an erroneous failure to allocate debts related to unpaid taxes on assets from a lawsuit settlement, rather than a proper application of tracing principles. She also challenges the court's maintenance award.

¶ 2. We conclude that Rose has failed to establish that the circuit court's property division and maintenance awards reflected an erroneous exercise of discretion. We further conclude that the court properly interpreted and applied the marital property agreement between Rose and Tony Steinmann, as well as the applicable facts of record and legal authority, in reaching its property division and maintenance award determinations. Consequently, we affirm.[2]

---

[1] *Steinmann v. Steinmann,* No. 2005AP1588, unpublished slip op. (Wis. Ct. App. Dec. 20, 2006).

[2] We affirm this case, and do not remand it to the circuit court. The circuit court appropriately declined to issue an order regarding tax liability when such liability had not yet been determined by the IRS. We similarly decline to remand the issue

I

¶ 3. Rose and Tony were married in 1994 and divorced in 2004. This was the second marriage for both, and no children were born of the marriage. Rose is the sole owner of Dairy Source, Inc. (DSI), a cheese brokerage and distribution company. At the time of the marriage, Tony worked for Berner Cheese Corporation (Berner), which purchased its raw materials from DSI, but in 1999, Tony resigned his position with Berner and Rose hired him to work for DSI.

¶ 4. A 1999 lawsuit filed by Tony, Rose and DSI against Berner was settled in 2001, resulting in a $1.35 million payment to Tony, Rose and DSI.[3] None of the parties reported the settlement to the IRS. Their failure to report the income from the settlement resulted in an IRS audit; the parties confirmed at oral argument that the IRS's final decision about tax liability, both as to the

of tax liability to the circuit court. However, our decision does not preclude either party from seeking a re-apportionment of tax liability after the IRS determination is complete.

[3] The terms of the settlement agreement, directing Berner to deliver a check for $1.35 million made payable to Rose, Tony, and the trust account of DSI's attorney, were not followed. Rose testified that Berner made a wire deposit of the entire settlement payment into the trust fund of the law firm. The firm then, upon Rose's orders, transferred the money directly into Rose's savings account, referred to at trial as the "1114 account," which also contained $12,000 and some income tax money deposited by Tony, and funds from DSI and the sale of their Delavan home. Although Rose has alternatively argued that either DSI alone or she alone is entitled to the settlement proceeds, even going so far as to testify at trial that Tony was not entitled to any of the settlement money, such a representation of the settlement agreement is clearly contradicted by the settlement terms, as the circuit court found.

amount and who will be held liable in what amount, remains pending.[4]

¶ 5. After they married,[5] the couple entered into a Limited Marital Property Classification Agreement (Agreement) which classifies various assets and income. The Agreement divided the Steinmanns' assets into categories of "marital property," "survivorship marital property,"[6] "individual property of Rose M. Steinmann," and "individual property of Tony K. Steinmann." The individual property lists for both Rose and Tony Steinmann include, in pertinent part:

1. All property whether Real or Personal which is listed on Schedule "A"[7] attached hereto and incorporated herein; and

2. All earnings of either Party after the date of the marriage. . . and

3. All property acquired at any time from a third party by gift, devise, bequest or inheritance; and

---

[4] The amount of tax liability appears to be over $3 million, both as described by Rose's attorney at oral argument and as attested to in an affidavit filed by Attorney Daniel B. Geraghty, who represented Rose and DSI in connection with IRS matters.

[5] Chris DiVincentis, a friend of the couple and the notary who signed the Marital Property Agreement (Agreement) at issue in this case, testified that the Agreement was backdated to March 3, 1995, at the request of Tony and Rose, in order to protect Rose's assets from Tony's ex-wife. DiVincentis could not recall when the Agreement was actually executed.

[6] The only assets explicitly listed by the Agreement as "survivorship marital property" are those entitled "Personal Effects of either Individual Party to the other Party." However, "All Personal Effects" are also listed as both Rose's and Tony's "individual property."

[7] Schedule "A" was not attached to the Agreement upon its inclusion in the record of this case.

4. All property acquired with any individual Property or acquired in exchange for any Individual Property or acquired from the proceeds of sale of any Individual Property. . . .

¶ 6. The Agreement was silent as to maintenance obligations should the marriage dissolve, but specified that the Agreement would be binding on the issue of property division in the event of divorce. However, the Agreement also provided that it could be modified or waived "by written instrument duly subscribed and acknowledged by the parties." In a hearing preceding the divorce trial, the Agreement was determined to be valid and enforceable, as well as "binding upon [the] court for property division pursuant to § 767.255(3)(L), Wis. Stats. [2003–04]."[8]

¶ 7. Prior to their marriage, Rose and Tony had purchased a residence in Delavan, Wisconsin, for $160,000, with both contributing to the down payment. The property was jointly titled. During the marriage, the couple purchased several additional properties, including a $2.2 million home on Lake Geneva (Loramoor residence). This property was also jointly titled, and the mortgage was held jointly. The Loramoor residence was purchased partially with proceeds from the Berner settlement.

¶ 8. Tony and Rose also purchased waterfront property on Lake Michigan and on Marco Island, Florida, and two boat slips at the Marco Island Yacht

---

[8] All subsequent references to the Wisconsin Statutes are to the 2003–04 version unless otherwise indicated. The divorce-related statutes referenced in this opinion were renumbered and/or revised in 2005–06, but the circuit court's judgment being appealed in this case occurred in 2004 and was based on the 2003–04 version of the Wisconsin Statutes. We therefore will refer to the older version's numbering and text.

41

Club, all of which were also jointly titled. These properties were all purchased at least partially through funds from Rose's 1114 savings account. Funds from that account were also used to purchase cars, boats, and an ATV. In addition, a series of private planes, yachts, and a Cadillac automobile owned by DSI were available for the Steinmanns' use.[9]

¶ 9. In the course of the marriage, Rose's income far exceeded Tony's. For example, Rose's cumulative net income for the years 1996 through 2002 was $873,645, while Tony's net income for those years was $120,687.[10]

¶ 10. Tony filed for divorce on February 28, 2003. Two months later, Rose terminated Tony from DSI. In May 2003, a family court commissioner issued a temporary order directing Rose to pay Tony $5,250 per month in maintenance because he was unemployed at the time. Rose was granted temporary use of the Loramoor residence. When Tony became employed again in June 2003, maintenance was reduced to $1,875 per month. However, the court vacated the maintenance awards the next year and ordered Tony to repay the $28,956 Rose had paid for maintenance, holding repayment in abeyance pending final property division. The court also ordered the sale of the Loramoor resi-

---

[9] While Rose's brief describes the use of the DSI property as "business use," the circuit court found that:

> [t]he parties flew in DSI's private plane to places like Marco Island, Florida, where they purchased a vacant lot in the expectation of building a retirement or vacation home. They bought two yacht slips on the island, where they moored DSI's yacht.

[10] During the trial, Tony testified that his salary was intentionally minimized in order to reduce his support obligations from his previous marriage.

dence[11] and continued a previously ordered freeze on the 1114 account, allowing only expenses for the Loramoor residence to be deducted from that account, and ordering that funds in the account could not fall below $100,000.

¶ 11. After an eight-day bench trial, the circuit court, Honorable Michael S. Gibbs presiding, granted the Steinmanns' divorce on December 17, 2004. At the time of the divorce, Rose reported an annual salary of $140,000, and Tony reported $85,000 in annual income.

¶ 12. In a decision issued on April 26, 2005, the circuit court awarded Tony $2,000 per month maintenance for ten years, the length of the marriage. The court ruled that individual property covered by the Agreement remained the sole property of that individual, but divided the marital property equally, including the Delavan home, the Loramoor residence, the Marco Island lot, the Lake Michigan lot, and the Marco Island boat slips, all of which were jointly titled. The circuit court rejected Rose's argument that the court should apply tracing principles to designate those properties her individual property, explaining that while the properties may have been purchased with Rose's individual assets, the joint titles rendered them marital property.

¶ 13. The court also divided the Berner settlement equally among Tony, Rose, and DSI. The court

---

[11] At a hearing on October 28, 2004, Rose was found in contempt of court for her failure to list the Loramoor residence for sale. She was ordered to serve six months in jail. The circuit court noted that she could purge the contempt by immediately executing a listing contract and vacating the premises. In November 2004, DSI purchased the Loramoor residence for the price of $3.23 million, and by order dated December 2, 2004, the sale was confirmed and the contempt sanction terminated.

noted that an IRS audit was underway regarding the income tax liability on the $1.35 million settlement, and declined to divide such pending tax liability of an undetermined amount.

¶ 14. A few additional marital property assets were not divided equally. An ATV, fishing boat, and automobile were awarded to Tony, while Rose was awarded a greater share of jewelry and household items. To arrive at a net equalization, in essence compensating Tony for being awarded the lesser share of those items not evenly divided, the court further ordered Rose to make a $13,433 equalization payment to Tony.

¶ 15. The court filed its Findings of Fact and Conclusions of Law and Judgment of Divorce on May 16, 2005. On June 8, 2005, after denying a motion for reconsideration and a motion to stay proceedings pending appeal, the court entered an order that the Corvette, pontoon boat, Marco Island lot, and Lake Michigan lot be sold and the proceeds divided equally. The court also ordered Rose to pay Tony $764,000, plus any accrued interest, for his share of the sale of the Loramoor residence.

¶ 16. Rose filed an appeal on June 16, 2005. In her appeal Rose made essentially the same arguments which she has continued to make to this court regarding tracing and transmutation, double-counting, tax liability, and the maintenance award. She also argued that the circuit court erred when it ordered the Loramoor residence sold before trial.[12]

¶ 17. The court of appeals affirmed the circuit court decision in *Steinmann v. Steinmann,* No. 2005AP1588, unpublished slip op. (Wis. Ct. App. Dec.

---

[12] She has apparently waived this argument, however, and we do not address it in this opinion.

20, 2006), ruling that the circuit court did not err in its property division and maintenance determinations. *Id.*, ¶ 41. The court rejected Rose's tracing arguments, concluding instead that the joint titles indicated donative intent and transformed the property from individual to marital property. *Id.*, ¶¶ 21–24. The court further held in pertinent part that the circuit court's double counting of assets was harmless error, that the circuit court properly considered the Berner settlement as a divisible asset while "refus[ing] to speculate on the ultimate financial penalty on the still-incomplete IRS audit . . .," and that the court's maintenance award was not an erroneous exercise of discretion. *Id.*, ¶¶ 31–34, 39–40.

¶ 18. Rose filed a petition for review, and we granted the petition. At oral argument, it was suggested that certain matters regarding the divorce were still pending in the circuit court. On October 11, 2007, this court directed the parties to file letters stating which matters are still pending in the circuit court. In his response letter, Tony asserted that a post-judgment order dated March 9, 2006, provides that tax liabilities may be revisited upon the sale of certain real estate. Rose responded that although there remains a pending sale of property, the circuit court did not hold open the issue of tax liability. In her response, she sought a remand order from this court directing the circuit court to evaluate new evidence on the tax issue when it comes in. Other than that, the parties appear to agree that there are no issues pending at the circuit court level and the divorce case has been designated as "closed."

¶ 19. We conclude for the below reasons that Rose has failed to establish that the circuit court's property division and maintenance award constitute reversible error.

## II

¶ 20. This case involves a circuit court's discretionary determinations. A circuit court's maintenance awards and property division determinations in divorce proceedings are within the sound discretion of the circuit court, and we will uphold such determinations unless the circuit court erroneously exercised its discretion. *See King v. King,* 224 Wis. 2d 235, 247–48, 590 N.W.2d 480 (1999); *Steinke v. Steinke,* 126 Wis. 2d 372, 383, 386, 376 N.W.2d 839 (1985). An erroneous exercise of discretion occurs if the circuit court makes an error in law, or fails to base its decision on the facts of record. *See Meyer v. Meyer,* 2000 WI 132, ¶ 15, 239 Wis. 2d 731, 620 N.W.2d 382.

¶ 21. This case also involves the interpretation of a marital property agreement. A marital property agreement is a contract, and its interpretation is consequently a legal question which we review de novo. *Gardner v. Gardner,* 190 Wis. 2d 216, 240, 527 N.W.2d 701 (Ct. App. 1994). The primary goal in interpreting a contract is to determine and give effect to the parties' intent. *Wis. Label Corp. v. Northbrook Prop. & Cas. Ins. Co.,* 2000 WI 26, ¶ 23, 233 Wis. 2d 314, 607 N.W.2d 276. When the language of a contract is unambiguous, we will apply its literal meaning. *Id.*

¶ 22. We address other questions of law as well in this case, such as the application of statutes to uncontested facts, which we generally review de novo. *See Minuteman, Inc. v. Alexander,* 147 Wis. 2d 842, 853, 434 N.W.2d 773 (1989).

## III

¶ 23. We first address Rose's arguments related to the circuit court's property division and interpretation of the Steinmanns' marital property agreement. There is no dispute that the Agreement is binding, valid and enforceable. Rather, the dispute between Tony and Rose pertains to the Agreement's reach and application in this case. Rose argues that in its property division determination, the circuit court should have applied tracing rather than transmutation principles. She argues that had the court properly applied tracing principles, it would have identified the jointly titled properties as her individual property under the Agreement and awarded Rose her full interest in those properties. She further argues that the court's conclusion that the deeds granting joint title reflected donative intent was factually as well as legally flawed. She also argues that the court improperly double-counted assets in its property division. Finally, she contends that the court should not have treated the Berner settlement as an asset without also allocating the pending debts related to unpaid taxes on the settlement.

### A

¶ 24. We begin by addressing the meaning and potential relevance of the tracing and transmutation principles referenced in this case. Rose maintains that the circuit court failed to give her marital property agreement with Tony proper consideration under Wis. Stat. § 767.255(3)(L). In particular, Rose argues that the Agreement exempts those of her assets from division that can be traced to their classification as individual property. She argues that the application of tracing principles to her case would reveal that the

property at issue[13] remained her individual property despite being jointly titled because it was purchased with her individual assets. As such, she contends, the court's award of assets to Tony based on the assets' joint titles rather than how they were purchased violated the terms and intent of the Agreement.

¶ 25. In a motion hearing, the circuit court found the Agreement to be "binding on the court for property division pursuant to Wis. Stat. § 767.255(3)(L)." Section 767.255(3) provides:

> (L) Any written agreement made by the parties before or during the marriage concerning any arrangement for property distribution . . . shall be binding upon the court except that no such agreement shall be binding where the terms of the agreement are inequitable as to either party. The court shall presume any such agreement to be equitable as to both parties.

The broader scheme of Wis. Stat. § 767.255, which addresses equitable property division in divorce actions, provides that while there is generally a presumption of equal property division, courts may nonetheless divide property in another manner after considering a number of factors, including marital property agreements.

¶ 26. Section 767.255(2), however, provides that gifted and inherited properties are generally exempt

---

[13] At issue are the Loramoor property, the Lake Michigan lot, the Marco Island lot, and the two boat slips at the Marco Island Yacht Club. These properties were purchased during the marriage and jointly titled, to "husband and wife," with Tony also listed as joint obligor on the Loramoor home's mortgage. Rose paid for the properties with a combination of credit card and funds from her 1114 account. The Delavan property is in its own category, as it was purchased before Tony and Rose married, and was expressly designated "marital property" by the Agreement.

from that presumption. Parties asserting that property, or some part of the value of property, is exempt from division have the burden of establishing that the property is non-divisible at the time of divorce. *See Derr v. Derr,* 2005 WI App 63, ¶ 11, 280 Wis. 2d 681, 696 N.W.2d 170. If a party meets that burden and makes a prima facie case that the subject property is exempt from division, "[t]he opposing party then has the opportunity to establish by sufficient countervailing evidence that the property is not gifted or inherited, or otherwise has lost its exempt status because its character or identity has not been preserved." *Brandt v. Brandt,* 145 Wis. 2d 394, 408–09, 427 N.W.2d 126 (Ct. App. 1988).

¶ 27. In this case, we are asked to address two related issues: whether, outside the context of gifted and inherited property, (1) tracing principles may be applied to determine a property's identity as individual property under a marital property agreement, and (2) transmutation principles and cases may be referenced to determine if that property has been reclassified as marital property.

¶ 28. The implication of the parties' arguments is that the answer to one of these questions will in turn determine the divisibility of the property in question. However, marital property classification, governed by ch. 766, is generally a separate inquiry from equitable property distribution, governed by ch. 767. *See Lloyd v. Lloyd,* 170 Wis. 2d 240, 258 & n. 6, 487 N.W.2d 647 (Ct. App. 1992). Unfortunately, the parties' marital property classification and divisibility arguments overlap, blurring the distinction between the two issues and chapters. Blurring the distinction even more is the face of the Agreement itself, which is titled under ch. 766 and primarily addresses property classification, but which

also states that it is binding on ch. 767 property division determinations. The interrelationship between the two statutory chapters in such a context has not been explicitly addressed by the parties. We therefore do not resolve in this case the exact nature of the relationship between chs. 766 and 767 in cases such as this one in which ch. 767 equitable property distribution determinations include consideration of ch. 766 marital property agreements, and in which marital property classification might be relevant to division. Rather, we focus on the tracing and transmutation arguments as presented by the parties.

1

■■■■■■

¶ 29. "Nonmarital property is exempt from property division if it retains its identity *and* character." *Trattles v. Trattles,* 126 Wis. 2d 219, 225, 376 N.W.2d 379 (Ct. App. 1985)(emphasis in original). The court of appeals has explained that character, which addresses how parties have chosen to title or treat non-marital assets, may be changed through transmutation of that non-marital property:

> Character addresses the manner in which the parties have chosen to title or treat gifted or inherited assets. Changing the character of such non-marital property can serve to transmute it to marital property. In such cases, the donative intent of the owner of the exempt property is an issue. Identity, on the other hand, addresses whether the gifted or inherited asset has been preserved in some present identifiable form so that it can be meaningfully valued and assigned.

*Brandt,* 145 Wis. 2d at 410–11 (citations omitted). Donative intent is presumed where property is trans-

ferred, or transmuted, from non-divisible property to joint tenancy subject to division. *See Derr,* 280 Wis. 2d 681, ¶¶ 35, 40.

¶ 30. In *Derr,* 280 Wis. 2d 681, ¶ 14, the court of appeals further explained that tracing determinations and transmutation (or donative intent)[14] determinations are inquiries that may provide assistance to courts

[14] In *Derr v. Derr,* 2005 WI App 63, ¶ 40 n.9, 280 Wis. 2d 681, 696 N.W.2d 170, the court of appeals used the phrase "donative intent" in discussing "transmutation," while also endorsing the phrase "loss of character" as preferable to the word "transmutation."

It is also worth noting that transmutation through conveyance of property through deed is of a different nature than transmutation through commingling of property through a bank account. *See* Brett R. Turner, *Equitable Distribution of Property,* § 5:65, at 649–50 (3d ed. 2005). *Also compare* Wis. Stat. § 766.63(1) (mixing separate and marital property in some cases "reclassifies the other property to marital property unless the component of the mixed property which is not marital property can be traced") *with* Wis. Stat. § 766.31(10) (explicitly allowing automatic reclassification through gift, conveyance, marital property agreement, and other means; and explaining that in cases involving transmutation through gifts, donative intent is the key to determining whether the property is marital or individual property).

As such, in the context of mixing separate and joint property in bank accounts, property that can be traced to its individual source is able to retain its separate property identity and character, and has not necessarily been transmuted through commingling or donative intent. *See, e.g., Doerr v. Doerr,* 189 Wis. 2d 112, 132–35, 525 N.W.2d 745 (1994); *Lloyd v. Lloyd,* 170 Wis. 2d 240, 254, 487 N.W.2d 647 (Ct. App. 1992). However, even in the context of mixed property in bank accounts, donative intent can establish transmutation of a property's character into joint property.

in ascertaining the identity and character of property. The court in *Derr* described tracing as useful in establishing a property's identity through its value and source, but suggested that its utility is limited because tracing does not generally reveal whether property is divisible. *Id.*, ¶¶ 15–16. In contrast, *Derr* asserted, a donative intent inquiry employing transmutation principles can help determine the character of property as divisible or not. *See id.*, ¶¶ 23–40 & n. 9. As such, tracing and transmutation are distinct principles which serve different functions related to identity and character.[15]

¶ 31. Ironically, both Tony and Rose want us to limit the holding of *Derr* and other cases employing tracing or transmutation principles to cases involving gifted and inherited properties, but in different ways and only so far as such limitations would serve their respective arguments.

¶ 32. Tony echoes the conclusions of the circuit court that tracing principles are applicable only to gifted and inherited property, while donative intent and transmutation inquiries may be applied in the absence of gifted or inherited property. Rose argues the reverse. She claims that while tracing principles are applicable in this case, transmutation only applies to gifted and inherited properties, citing *Gardner*, 190 Wis. 2d at 236.

¶ 33. If *Gardner* created such a bright-line limitation, we conclude it was wrongly decided. The cases

---

[15] As one treatise explains,

> transmutation by gift or agreement has no connection with the law of tracing. In many if not most cases finding this form of transmutation, the formerly-separate asset involved is easily identifiable. The basis for treating the asset as marital property is not any failure of identification, but rather a finding that the owner of the separate property voluntarily gave up his or her separate interest.

Turner, *Equitable Distribution of Property* § 5:65, at 650.

*Gardner* cites as "by their very terms . . . limited to cases involving gifted or inherited property," *id.* at 236 & n.1, do not in fact contain such limiting language. *See Fowler v. Fowler,* 158 Wis. 2d 508, 463 N.W.2d 370 (Ct. App. 1990); *Brandt,* 145 Wis. 2d 394; *Trattles,* 126 Wis. 2d 219. Rather, two of the three cases both use the broad phrase "separately owned property," not a more narrow descriptor limiting application to just gifted and inherited property. *See Trattles,* 126 Wis. 2d at 225 ("The transfer of separately owned property into joint tenancy changes the character of the ownership interest in the entire property into marital property which is subject to division."); *Fowler,* 158 Wis. 2d at 518 (quoting *Trattles*). *See also Bonnell v. Bonnell,* 117 Wis. 2d 241, 245, 344 N.W.2d 123 (1984) ("We have held in several cases that a spouse can transfer into the marital estate property which would otherwise be retained as the spouse's separate property."). As such, if *Gardner* is read as prohibiting the application of tracing and transmutation principles to cases not involving gifted and inherited property, *Gardner* was wrongly decided. However, the case need not be read as imposing such a bright-line rule. Rather, *Gardner* should be read as merely acknowledging that all of the cases that court's analysis addressed involved gifted and inherited property, without precluding the application of tracing or transmutation principles beyond that context.

¶ 34. We conclude that the parties are wrong in arguing that tracing and transmutation principles may not be applied to cases that do not involve gifted or inherited property. However, both parties, as well as the circuit court in this case and the court of appeals in *Gardner,* have cause for singling out gifted and inherited property for different treatment: the text of Wis.

Stat. § 767.255(2) explicitly lists gifted and inherited property among the types of property presumed to be exempt from property division. As such, both tracing and transmutation have particular relevance for determinations involving gifted or inherited property. Tracing can identify such property as originally indivisible, but proof of donative intent can still establish that the property's identity and character changed, and it was transmuted into divisible joint property.

¶ 35. In particular, when separate property presumed to be indivisible is transmuted through a joint tenancy, it is effectively transferred to marital property, and tracing does not cause the property to revert back to its original separate property identity. In such cases, "[t]he transfer of separately owned property into joint tenancy changes the character of the ownership interest in the entire property into marital property which is subject to division." *Trattles,* 126 Wis. 2d at 225; *Fowler,* 158 Wis. 2d at 518.

¶ 36. While tracing and transmutation may have particular significance in cases involving gifted and inherited property, we reject the attempts by the parties to establish an absolute prohibition on the use of tracing or transmutation principles absent the presence of gifted or inherited property.

¶ 37. We did not limit our holding that "the transfer of separate, inherited property into a joint tenancy changes the nature of the property interest" in *Bonnell,* 117 Wis. 2d at 246–47, to gifted or inherited property. Rather, we spoke in broader terms about joint tenancies being valid transmutations of separate property, "*whatever* the prior ownership interest of each party." *Id.* at 247 (emphasis added). In addition, as we have explained, *Gardner* does not establish such a bright-line

rule excluding either tracing or transmutation principles from being applied in contexts outside gifted or inherited property.

¶ 38. Furthermore, there is no compelling policy reason for rendering transmutation or donative intent principles inapplicable to property initially classified as individual property under a marital property agreement. While gifted and inherited property is generally considered untouchable for purposes of division under Wis. Stat. § 767.255, property classified as separate property by a marital property agreement does not receive such an express presumption of indivisibility under § 767.255. Rose fails to explain why her property is even more untouchable and incapable of being transferred into divisible property than property statutorily rendered indivisible.

2

¶ 39. Although we conclude that tracing and transmutation principles may be employed outside the context of gifted and inherited property, the application of these principles in the present case does not affect the ultimate determination regarding equitable property distribution.

¶ 40. Turning to the issue of tracing principles specifically, we note that Rose has not established that even if the circuit court had applied tracing principles, it would have found that the properties in question were purchased solely with Rose's individual assets, rendering them individual property. While it is true that the properties were purchased with funds from Rose's 1114 account, it is also the case that the 1114 account included $12,000 deposited by Tony, funds from

55

the sale of the jointly owned Delavan house, some income tax money deposited by Tony, and Tony's share of the Berner settlement. Rose has not provided any accounting proving that it was her money from the 1114 account, not Tony's, that was used to purchase the jointly titled property.

¶ 41. However, assuming without concluding that tracing principles, once employed, would establish that those properties were purchased with Rose's individual assets and not Tony's, and therefore identified as her individual property under the Agreement, such a determination would not answer the question of divisibility. Rose does not explain why the mere application of tracing principles to determine a property's classification under the Agreement precludes that property from either being reclassified as marital property, or, even more pertinently, divided under Wis. Stat. § 767.255.

¶ 42. Rose cites a number of cases applying tracing principles in various contexts, *Weger v. Erasmus,* 71 Wis. 2d 484, 241 N.W.2d 157 (1976); *Truelsch v. Northwestern Mutual Life Insurance Co.,* 186 Wis. 239, 202 N.W. 352 (1925); *Henika v. Heinemann,* 90 Wis. 478, 63 N.W. 1047 (1895); *Derr,* 280 Wis. 2d 681; *Brandt,* 145 Wis. 2d 394; and *Trattles,* 126 Wis. 2d 219.

¶ 43. None of these cases support the conclusion Rose asks us to make, since they do not address whether property, once traced to an individual property classification under a marital property agreement, is thereby precluded from later being reclassified as marital property through joint titling[16] or from being di-

---

[16] Indeed, Wis. Stat. § 766.31 explicitly allows property classified as individual property under a marital property agreement (as well as gifts, inheritances, and other separate

vided under Wis. Stat. § 767.255. To the contrary, *Derr,* which Rose relies on, explains that "tracing is nothing more than the exercise of following an asset trail. If an asset, or component part of an asset, can be traced to a source, we then rely on *other* principles and rules to determine whether the traced asset is divisible or non-divisible." *Derr,* 280 Wis. 2d 681, ¶ 19 (emphasis in original). The " 'mere fact that the existence of this subsequently purchased property can be traced to income generated by' non-divisible property does not mean that the purchased property is non-divisible." *Id.,* ¶ 16 (quoting *Arneson v. Arneson,* 120 Wis. 2d 236, 244, 355 N.W.2d 16 (Ct. App. 1984)). Rather, we have explained that once property is transferred from separate property to joint ownership, the property becomes part of the marital estate subject to division even if it is inherited property generally deemed indivisible. *See Bonnell,* 117 Wis. 2d at 246–47.

¶ 44. Rose's reference to the text of the Agreement does not further her dual arguments that the necessary effects of applying tracing principles are (1) to forever freeze the classification of her property as individual rather than marital property even after it is jointly titled, and (2) to shield the property from divisibility. There is nothing in the language of the Agreement generally requiring tracing principles to be applied, or more specifically, requiring that property classified as individual property under the Agreement must remain individual property. More importantly,

property) to be reclassified as marital property through a gift, deed or other conveyance. Wis. Stat. § 766.31(7), (10). As such, this statute appears to allow the type of reclassification, or transmutation, from which Rose claims her property is exempt, although not necessarily in a ch. 767 property division context.

there is no language in the Agreement prohibiting division of such property upon divorce. Even the Agreement's "binding on the issue of property division" language does not in itself preclude equitable division of property that has been jointly titled.

¶ 45. Rose emphasizes the language in the Agreement that "[t]his agreement represents the entire agreement and understanding between the parties regarding the property and obligations described herein, and this Agreement shall not be modified or waived *except by written instrument duly subscribed and acknowledged by the parties.*" (Emphasis added.) What she does not discuss, however, is that clause's "duly subscribed" written instrument exception. Specifically, Rose does not explain why a deed conveying joint title to one of her properties would not qualify as such a written instrument. In explicitly allowing such modification or waiver through written instrument, the Agreement allows parties to reclassify individual property as marital property through signed and acknowledged conveyances, as occurred in this case. In contrast, there is nothing in the language of the Agreement that prevents the jointly titled property in this case from being equitably divided under Wis. Stat. § 767.255.

3

¶ 46. While it may be possible, though debatable, that Rose could trace her assets to their separate property identity under the Agreement, there is no question that Tony has nonetheless established that that separate property was transmuted to marital property by the deeds conveying joint title. Consequently, the circuit court's transmutation analysis was sound, clearly based on the facts of the record and on a correct

application of the law, and therefore did not constitute an erroneous exercise of discretion.

¶ 47. In its decision, the court found that although some of Rose's assets may have been used to purchase certain properties, "they were then jointly titled, which transmutes them into marital property." The court also found "incredible" Rose's testimony that she did not mean to convey the properties to Tony during her lifetime but rather only wanted to ensure he received them in the event of her death while they were married.

¶ 48. Rose urges us to rule the circuit court's finding of donative intent to be erroneous on two grounds: (1) the court's conclusion improperly relied on "transmutation" cases; and (2) the court should not have rejected her "uncontroverted" testimony. We reject both arguments.

¶ 49. As to the first point, for the reasons we have already set forth, the circuit court was not prohibited from applying "transmutation" principles, although the result of applying transmutation principles in this case is less transformative than it would be in gifted and inherited property cases, the property in this case not being established by statute as presumptively indivisible in the first place.[17] Rose provides no authority for her argument that the joint titling of her individual property to Tony should not be honored as valid for purposes of reclassifying it as marital property.

---

[17] If Rose means to suggest that we should treat the Agreement as deeming her property to be presumptively indivisible in the same manner that Wis. Stat. § 767.255 renders other property presumptively indivisible, we decline to do so. While the Agreement does mention property division, it also indicates that the terms of the Agreement are subject to change by written instrument.

¶ 50. We also reject Rose's contention that the court's donative intent determination lacked an evidentiary basis. In honoring Rose's transfer of her individual property through deeds granting joint title, the circuit court concluded that the language of the deeds created an inference of donative intent.

¶ 51. This conclusion comports with the well-established rule of law that the execution and delivery of a deed "raises the presumption the grantors intended the consequences of their acts and what the deed purported to convey." *Seraphine v. Hardiman,* 44 Wis. 2d 60, 66, 170 N.W.2d 739 (1969). In the absence of countervailing evidence, gifting is the only reasonable inference. *See Derr,* 280 Wis. 2d 681, ¶ 33; *Trattles,* 126 Wis. 2d at 222–224. The circuit court's consideration of the deeds conveying joint title as evincing donative intent in this case was also consistent with Wisconsin cases recognizing a joint title gift presumption, i.e., that jointly titled property is presumed to be a gift to the marital estate. *See Weiss v. Weiss,* 122 Wis. 2d 688, 693, 365 N.W.2d 608 (Ct. App. 1985). *See also* Brett R. Turner, *Equitable Distribution of Property,* § 5:43, at 476 (3d ed. 2005)("The joint title gift presumption is presently recognized in a majority of American jurisdictions."); Oldfather, et al., *Valuation and Distribution of Marital Property,* § 18.07[3][c], at 18–68.2 (2005)(When property is transmuted "by placing separate property in the joint names of the spouses," the result in most jurisdictions is "a presumption that there was an intention to treat the property as marital property rather than its original form of separate property.").

¶ 52. Consequently, in cases such as this one in which property is jointly titled, the property does not retain its character as separate property but instead

becomes part of the marital estate. *See Weiss,* 122 Wis. 2d at 692–93 (citing *Bonnell,* 117 Wis. 2d. at 247; Wis. Stat. § 700.17(2)(a)).

¶ 53. *Weiss* is similar to the present case in that Mr. Weiss denied that he had donative intent when he created a joint tenancy. However, the court rejected his argument, explaining that

> *Bonnell* recognized the general principal " 'that a spouse may by agreement, either express or implied, or by gift, transmute an item of separate property into marital property.' " Here also, Daniel has manifested his intent to make a gift by the conversion of his separate property into a joint tenancy with Carol. Just as *Bonnell* observed that "[i]t is clear that Mrs. Bonnell intended to create a joint tenancy in the subject properties," so also is it clear in this case that Daniel harbored a similar intent.

*Weiss,* 122 Wis. 2d at 693 (citations omitted). Rose similarly denies donative intent in this case, but the circuit court rejected her denial, concluding that the deed conveyance and other evidence outweighed her verbal denial of donative intent. Rose argues that the circuit court should have considered the jointly titled property to be individual property because her uncontroverted testimony revealed that she did not intend to gift the property to Tony by including him on the deeds as joint owner. She cites *Weberg v. Weberg,* 158 Wis. 2d 540, 463 N.W.2d 382 (Ct. App. 1990), for the proposition that the circuit court cannot disregard uncontroverted testimony unless there is something in the case that discredits the testimony. However, *Weberg* does not support Rose's arguments.

¶ 54. In *Weberg,* the circuit court accepted Mr. Weberg's explanation that he had no donative intent, and the court of appeals did not upset that factual

finding. *Id.* at 550–52. Unlike *Weberg,* this case involved transferring property through deeds conveying joint title, which the circuit court recognized as effective transmutation. As such, even applying the same degree of deference in this case as the appellate court did in *Weberg,* we affirm, not reverse, the court's finding of donative intent.

■■■■■■

¶ 55.　The determination of credibility is similarly a matter within the circuit court's discretion. *Johnson v. Merta,* 95 Wis. 2d 141, 151, 289 N.W.2d 813 (1980). Here, the court reasonably found that Rose's donative intent was manifested by deeds creating joint tenancy. The court concluded that the deeds meant what they said and granted Tony joint title to the property as of the date of the title, and not just upon Rose's death.

¶ 56.　While it may be both true and unsurprising that Rose was the only one who testified about her own subjective intent, the circuit court was not required to accept her testimony as credible. The court explained its basis for rejecting as incredible Rose's denial of donative intent in the following terms:

> Rose testified as to the careful, calculating and methodical steps she takes with regard to all aspects of her life and finances, yet wants the Court to believe that in this one area, she meant to keep the properties as hers alone and was only protecting Tony's interests should she die. The Court finds this testimony to be incredible. Rose is a business woman, well acquainted with the legal system as evidenced by her involvement in numerous lawsuits. If she truly meant to provide for Tony upon her death, yet protect her individual assets, the Court believes she would have titled everything in her name and taken care of Tony in a will. The Court finds that the only reasonable explanation for the joint

titling was that it was the intent of the parties for the properties to be jointly held. Therefore, they are marital and subject to division.

¶ 57. We do not view the court's determination to be reversible error. The circuit court was not obligated to accept Rose's testimony about her subjective thoughts as uncontradicted testimony. *See Derr,* 280 Wis. 2d 681, ¶ 40. Furthermore, courts may consider evidence other than contradictory testimony when finding testimony incredible. *See Schwegler v. Schwegler,* 142 Wis. 2d 362, 368, 417 N.W.2d 420 (Ct. App. 1987). In this case, the circuit court set forth a sufficient basis for its determination.

¶ 58. Rose has not established that the court's ruling was reversible error. Beyond the testimony which the circuit court found lacking in credibility, Rose points to no other evidence establishing that she did not intend for the joint titling of the property to take full legal effect until after she died. As such, we defer to the circuit court's finding of donative intent and its credibility findings, as the *Weberg* court did in that case.

¶ 59. As a final note on tracing and transmutation, we again emphasize that this case involves transmutation by gift, rendering tracing less relevant than if the case did not involve such evidence of donative intent. In this case, since the property at issue was not presumed indivisible by statute, it was potentially divisible all along.

¶ 60. The issues of tracing and transmutation are only relevant because Rose has, in essence, asked us to treat the Agreement as creating a presumption of indivisibility equal to the presumption of indivisibility statutorily accorded to certain properties under Wis. Stat. § 767.255. We conclude that the Agreement did

not, in the end, create such an extension of statutory exemptions, and that even if it had, the property would have been rendered divisible through transmutation by gift.

¶ 61. In sum, although we disagree with the circuit court to the extent that we reject any bright-line rule limiting tracing to gifted and inherited property cases, we agree with the court's ultimate conclusions. Rose has failed to show why the court's property division was erroneous.

B

¶ 62. Rose argues that the circuit court committed a "double-counting error." She contends that the court erred by first awarding Tony half of the Delavan and Loramoor home sale proceeds and one-third of the Berner settlement, and then awarding him assets that had been purchased with those funds. Tony conceded in his court of appeals brief that the court may have technically engaged in double-counting, but argues that any error was harmless. The court of appeals agreed, and so do we.

¶ 63. To establish reversible error, the complaining party must establish that the error complained of has affected his or her substantial rights. Wis. Stat. § 805.18(2). In this case, Rose fails to demonstrate how any double-counting of assets affected her substantial rights, or more specifically, affected the equitable distribution of property. It seems apparent from the court's calculations that the net result—an even distribution—would not have changed had the court left either the settlement or one of the joint properties out of its division.

¶ 64. In its property division, the circuit court divided the majority of marital assets equally between the parties. The court allocated equal portions of the $1.35 million Berner settlement to Tony, Rose, and DSI, crediting each party $450,000. Similarly, the jointly titled property was divided evenly between Tony and Rose. In the court's marital property division, the only equalization payment ordered was for Rose to compensate Tony for those assets to which she was allocated a greater share; namely, jewelry and certain household items. Otherwise, the court engaged in an even-handed division of the parties' assets. Removing one of the double-counted items from the list would not have had a meaningful effect on the property division, since the property still would have been divided evenly. As such, there is no apparent harm resulting from any double-counting by the court.

¶ 65. Rose argues that the harm resulting from the court's "double-counting" was that, by characterizing the Berner settlement as an asset "even though," in her words, "it no longer existed," the court calculated an inflated net total which could adversely affect DSI, Rose, or Tony in tax and business matters.

¶ 66. Rose's argument about potential tax and business consequences is speculative and undeveloped. In addition, she provides no citation in the record to establish that the settlement money no longer existed by the time of the divorce. Her commentary about the settlement money being gone is also troubling in that it calls to mind the fact that Rose herself ordered the entire settlement award, which was supposed to be shared evenly among herself, Tony, and her business, to be distributed directly into her account. Consequently, she herself is responsible for any "nonexistence" of the settlement funds, which were distributed solely to her

bank account by her order. Rose implies that the settlement money was spent on the property purchased during the marriage, but even if she had demonstrated what percentage of her property purchases came from settlement funds, which she has not, her expenditure of the settlement funds, which presumably included Tony's share, cannot be a valid basis for denying Tony credit for the settlement in the court's asset distribution calculations.[18] For Rose to claim that the money she had taken no longer existed, and that the court should therefore not credit Tony's share of the settlement to him in its asset allocations, is beyond the pale.

¶ 67. Consequently, Rose's argument that the circuit court's property division included an erroneous

---

[18] Another contradictory argument Rose makes in reference to the distribution of the Berner settlement funds is that as a result of the court's equal division of those assets, DSI, which she owns solely, could potentially be liable for one-third of the back taxes stemming from the Berner settlement. Remarkably, she claims that this result would be unfair in part because DSI did not receive one-third of the settlement, even though she herself is responsible for DSI not receiving its share, the funds having been deposited by her order into her bank account. Further, her argument that DSI received nothing conflicts with her argument to the court of appeals that DSI should be listed as the sole beneficiary of the Berner settlement for property division purposes.

While it is a difficult challenge sorting through the conflicting testimony and argument presented in this case, it appears that Rose's argument comes down to the following series of conflicting statements: although the settlement proceeds were deposited into Rose's bank account and she controlled what became of them, and although she has argued that DSI was entitled to the entire settlement amount, she also argues that because DSI never received that amount from her, the court should award her for not paying DSI its fair share of the settlement. We decline to do so.

"double-counting" of assets which caused her harm does not withstand close scrutiny. To the extent the circuit court may have engaged in double-counting by itemizing and dividing some assets that had already been converted to other assets, such double-counting was harmless error. *See Helmbrecht v. St. Paul Ins. Co.*, 122 Wis. 2d 94, 123, 362 N.W.2d 118 (1985).

## C

¶ 68. Rose also criticizes as erroneous the circuit court's refusal to divide tax liability prior to a final IRS determination regarding taxes owed on the Berner settlement. The circuit court ruled:

> [T]he IRS audit is not complete and the Court does not speculate on what the ultimate financial penalty will be. However, it does seem to the Court that as both Rose and Tony failed to report the income, both will have a consequence. Therefore as each faces potential liability, this factor does not sway the balance of the property division.

Rose maintains that this ruling violated Wis. Stat. § 767.255's mandate that debts be divided at divorce.

¶ 69. While it is true that Wis. Stat. § 767.255(1) requires courts to divide the property of divorcing parties, the statute does not require courts to divide every potential debt of the parties, particularly when the precise dollar amount of a debt has not yet been determined. Circuit courts are not obligated in the course of their property division determinations to consider hypothetical or theoretical debts. *See Ondrasek v. Ondrasek*, 126 Wis. 2d 469, 480, 377 N.W.2d 190 (Ct. App. 1985).

¶ 70. Rose attempts to distinguish *Ondrasek* by arguing that in this case, the multi-million dollar IRS tax liability was not hypothetical.[19] However, the parties agree that the IRS case is still pending, with the final amount of tax liability for Rose and Tony still unknown. As such, the future tax liability potentially tied to the Berner settlement was too speculative to expect the circuit court to make any kind of precise division of debts based on an unknown amount of future tax liability.

¶ 71. Although in 2004 the IRS issued a letter describing a $1,780,107 deficiency, that determination was appealed, and a final IRS determination as to the amount of taxes owed by Rose and Tony remains pending. Without such a final IRS determination, the court properly refused to allocate tax liability based on speculation or conjecture. *See Logemann Bros. Co. v. Redlin Browne, S.C.*, 205 Wis. 2d 356, 363, 556 N.W.2d 388 (Ct. App. 1996); *Brandt,* 145 Wis. 2d at 419–420.

¶ 72. Rose further argues that the circuit court's failure to take into account the tax liability resulted in a grossly overvalued marital estate, citing *Lacey v. Lacey,* 61 Wis. 2d 604, 609–10, 213 N.W.2d 80 (1973). *Lacey* is inapposite, however, in that it pertains to a court's obligation to consider the real estate taxes which are due and owing on a property when considering that

---

[19] Rose does not, notably, invoke Wis. Stat. 767.255(3)(k), the only provision of that statute explicitly addressing consideration of tax consequences. The provision only speaks in permissive, not mandatory terms, providing that a court may alter the presumptive equal property division, but only after considering a number of factors, one of which is the tax consequences to the parties of deviating from equal division. In this case, the circuit court did not deviate from an equal division scheme. Consequently, subsection (3)(k) did not come into play.

property's value. *Id.* The potential taxes that Rose argues the circuit court should have considered were not taxes due and owing for real estate. Most critically, unlike the taxes in *Lacey,* the amount of taxes owed in this case is still in dispute and under determination.

¶ 73. Had the circuit court allocated tax liability based upon speculation in this case, the parties could have found themselves back in court to amend the circuit court's order based upon the IRS determination. We agree with the lower courts in this case that the IRS is best qualified to determine what amount a divorcing couple owes the IRS.

¶ 74. Although it was not required to, the circuit court in this case did expressly consider the parties' potential future tax liability in its property division determination in the process of dividing the parties' property under Wis. Stat. § 767.255(1). On the record, the court considered Rose's arguments and explained why it rejected them. The court recognized that both parties would likely face tax consequences due to the pending IRS case resulting from the Steinmanns' failure to report the Berner settlement, and that, considering the ongoing and unresolved nature of the IRS case, it would not be prudent to prematurely divide tax liabilities that had not yet been assigned.[20]

---

[20] Although the amount of the tax liability for the $1.35 million settlement remains undetermined, the parties agree that the existence of tax liability for that settlement is certain. Indeed, the circuit court observed that "[t]here will be tax consequences to [Rose and Tony]." The matter is currently pending with the IRS, which presumably will determine the amount of taxes owed on the settlement.

As we have noted, the circuit court declined to rule on the division of tax liability between Rose and Tony. This was a proper exercise of discretion, given the uncertain amount of the

69

¶ 75. It is apparent from the circuit court's explanation that it properly exercised its discretion. *See Grace v. Grace*, 195 Wis. 2d 153, 157, 536 N.W.2d 109 (Ct. App. 1995). We see no reasonable grounds for reversing the circuit court's decision not to allocate debts based on future tax liability, the exact amount of which is still a matter of speculation.

## IV

¶ 76. Finally, we address whether the circuit court's maintenance award was erroneous. Wisconsin Stat. § 767.26 provides:

Upon every judgment of annulment, divorce or legal separation, or in rendering a judgment in an action under s. 767.02(1)(g) or (j), the court may grant an order requiring maintenance payments to either party for a limited or indefinite length of time after considering:

(1) The length of the marriage.

(2) The age and physical and emotional health of the parties.

(3) The division of property made under s. 767.255.

(4) The educational level of each party at the time of marriage and at the time the action is commenced.

(5) The earning capacity of the party seeking maintenance . . . .

---

liability. However, the parties in this case may still move the circuit court to apportion tax liability after the IRS determines the amount of taxes they owe on the Berner settlement.

(6) The feasibility that the party seeking maintenance can become self-supporting *at a standard of living reasonably comparable to that enjoyed during the marriage,* and, if so, the length of time necessary to achieve this goal.

(7) The tax consequences to each party.

(8) Any mutual agreement made by the parties before or during the marriage, according to the terms of which one party has made financial or service contributions to the other with the expectation of reciprocation or other compensation in the future, where such repayment has not been made, or any mutual agreement made by the parties before or during the marriage *concerning any arrangement for the financial support of the parties.*

(9) The contribution by one party to the education, training or increased earning power of the other.

(10) Such other factors as the court may in each individual case determine to be relevant.

(Emphasis added.) In our review of discretionary maintenance awards, we determine whether the circuit court applied these statutory factors in a manner that achieves the dual objectives of fairness and provision of support. *LaRocque v. LaRocque,* 139 Wis. 2d 23, 32–33, 406 N.W.2d 736 (1987).

¶ 77. The determination of the amount and duration of maintenance is entrusted to the sound discretion of the circuit court, and we will not disturb these findings where the record shows that the court considered the facts and came to a reasonable conclusion consistent with applicable law. *LaRocque,* 139 Wis. 2d at 27. In this case, the court cited *LaRocque,* recogniz-

71

ing that a maintenance award must ensure that there is a fair and equitable financial arrangement between the parties. The court's methodical and carefully explained analysis reflects that it took such steps to ensure an equitable result.

¶ 78. In particular, the circuit court reviewed the relevant facts presented to it and applied them to the statutory factors outlined in Wis. Stat. § 767.26. The court examined the length of the Steinmanns' marriage, their health, education, and employment, the marital property agreement, Tony's ability to be self-supportive through his employment, tax problems, property division, and the parties' furtherance of each others' careers and earning abilities.

¶ 79. The court also addressed Tony's ability to support himself "at a standard reasonably comparable to what he enjoyed during the marriage," elaborating:

> While Tony certainly has the means to support himself through his employment ($85,000 annual salary) the Court does not believe this salary can support him at a level reasonably comparable to what he enjoyed during the marriage. It is apparent to the Court that the parties enjoyed an opulent lifestyle . . . . The parties flew in DSI's private plane to places like Marco Island, Florida, where they purchased a vacant lot in the expectation of building a retirement or vacation home. They bought two yacht slips on the island, where they moored DSI's yacht. They enjoyed several successive yachts during the course of their marriage . . . . They purchased land on Lake Michigan with the hopes of building another home there as well. They traveled, and made improvements to their Delavan home. Toward the end of their marriage they purchased a home on Geneva Lake and made extensive improvements to it. Rose and Tony enjoyed a luxurious lifestyle together that Tony cannot sustain on his own salary. Rose earns $55,000 more per year in reported salary and continues

to enjoy the perks that DSI provides. As the sole owner of DSI, she is the beneficiary of its profits as well.

In support of its analysis, the court cited case law providing that maintenance is measured by the parties' lifestyles immediately before the divorce and which they would keep enjoying had they stayed married. Consequently, the court found it necessary to award maintenance because although Tony's income was good, "it is not commensurate with the income and living standard he enjoyed while married to Rose."

¶ 80. Rose has not explained how the circuit court's findings were clearly erroneous or offered any evidence from the record to contradict these findings. She does not accuse the court of either failing to consider the Wis. Stat. § 767.26 factors or failing to do so in a manner which properly balances support and fairness concerns. Rather, she repeats her previous charge that the circuit court failed to take into account the Agreement, altering that now familiar refrain only to add in this context that the Agreement protects her income and assets not just from property division, but also from being subject to a maintenance award.

¶ 81. Perhaps Rose means to implicitly invoke Wis. Stat. § 767.26(8), the provision of the maintenance statute that addresses marital property agreements. If so, she does not explain how § 767.26(8), which directs trial courts to consider those mutual agreements "made by the parties before or during the marriage concerning any arrangement for the financial support of the parties," operates to shield her assets from a maintenance award. This subsection of the maintenance statute plainly applies only to those marital agreements with maintenance provisions. The Agreement in this case does not have such a provision.

73

¶ 82. Parties with marital property agreements are not, as a matter of law, exempt from maintenance awards. Rose had the opportunity upon drafting the Agreement to include a maintenance provision pursuant to Wis. Stat. § 767.26(8) concerning financial support arrangements. For whatever reason, Rose did not do so. A maintenance provision in the Agreement would have been an appropriate factor for the court to consider.

¶ 83. Rose further maintains that there is no precedent for allowing maintenance awards based upon an "opulent lifestyle" that was made possible by her individual assets, citing *Gerrits v. Gerrits,* 167 Wis. 2d 429, 443 n.8, 482 N.W.2d 134 (Ct. App. 1992). She further criticizes the "opulent lifestyle" conclusion of the circuit court as based as well on an improper consideration of the parties' business use of a DSI company yacht and company airplane. She argues that *LaRocque,* 139 Wis. 2d at 31–32, and *Bahr v. Bahr,* 107 Wis. 2d 72, 83, 318 N.W.2d 391 (1982), are distinguishable from the present case because in those cases, the spouses requesting maintenance had supported their long marriages by providing childcare and homemaking.

¶ 84. However, the text of Wis. Stat. § 767.26(6) clearly contemplates maintenance being awarded to help a former spouse maintain his opulent "standard of living reasonably comparable to that enjoyed during the marriage." There is nothing in the text of the statute requiring that such spouses first have contributed to the household or childrearing to a certain degree. Nor does the statute condition a court's order maintaining such a standard of living upon the opulent standard of living being the result of both incomes. Indeed, the

general nature of a maintenance award is the payment of assets from one individual to another. If Tony's income had equally resulted in the Steinmanns' opulent lifestyle, that would actually diminish the appropriateness of a maintenance award under the statutory scheme of Wis. Stat. § 767.26. Moreover, while Rose's brief describes the use of the DSI property as "business use," the circuit court found that:

> [t]he parties flew in DSI's private plane to places like Marco Island, Florida, where they purchased a vacant lot in the expectation of building a retirement or vacation home. They bought two yacht slips on the island, where they moored DSI's yacht.

¶ 85. The amount and duration of maintenance is within the circuit court's discretion, and is to be measured "by the lifestyle that the parties enjoyed in the years immediately before the divorce and could anticipate enjoying if they were to stay married." *LaRocque,* 139 Wis. 2d at 36. The marital standard of living which a court seeks to preserve is a case-by-case individual determination. *Hubert v. Hubert,* 159 Wis. 2d 803, 819, 465 N.W.2d 252 (Ct. App. 1990). "There is no requirement that maintenance is limited to an amount that will permit the recipient to enjoy an *average* standard of living." *Id.* (emphasis in original). As such, there is no basis for reversing the circuit court's discretionary determination. *See Grace,* 195 Wis. 2d at 157.

¶ 86. Rose also points out that the circuit court's maintenance awards were inconsistent in that it had terminated its initial maintenance award, but later reinstated an award. She further points out that the circuit court reversed itself in finding: (1) that a ten-year marriage was a long marriage, where it previ-

ously held that ten years was a short-term marriage; (2) that Tony could not enjoy a comparable lifestyle on his income, where it had previously found he could sufficiently support himself; (3) that Tony had contributed to Rose's success with DSI, where it had previously found he had not; and (4) that Rose's income was not protected by the Agreement, where it had previously found that it was.

¶ 87. Despite the inconsistent seeming portrait Rose paints of the court's maintenance decisions, the court's findings were not necessarily contradictory. The court made initial findings for purposes of a maintenance award prior to trial. However, after an eight-day trial, the court reversed its position in light of new evidence not previously available. Most significantly, the court explained the change in maintenance requirements as resulting from changes in Tony's employment status.

¶ 88. Finally, we have ruled that courts may determine maintenance awards by starting with the proposition that the dependent partner may be entitled to fifty percent of the total earnings of both parties. *Bahr*, 107 Wis. 2d at 85. At the time of trial, Rose's income was $140,000 annually and Tony's was $85,000. The circuit court determined that maintenance in the amount of $24,000 per year, which fell short of equalizing Rose's and Tony's annual incomes and left Rose more than a fifty percent allocation, was fair to the parties. The circuit court also noted that while the maintenance award reduced Rose's annual income to $116,000, she enjoyed many financial and lifestyle perks from DSI that, if considered to be part of her income, would elevate her actual income far beyond the $140,000 annual salary the court calculated.

¶ 89. As with her other arguments, Rose relies extensively on the existence of the Agreement between her and Tony, but that Agreement once again does not speak to the issue at hand. The Agreement is silent on the maintenance issue, which, if anything, weighs in favor of granting a maintenance award. Because Rose has failed to establish that the court's maintenance award constituted an erroneous exercise of discretion, we defer to the circuit court's maintenance determination in this case.

## V

¶ 90. We conclude that the circuit court's property division and maintenance awards were not erroneous. We further conclude that the court properly interpreted and applied the marital property agreement between Rose and Tony Steinmann, as well as the applicable facts of record and law, in reaching its property division and maintenance award determinations. Consequently, we affirm.[21]

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 91. ANNETTE KINGSLAND ZIEGLER, J., did not participate.

[21] We affirm this case, and do not remand it to the circuit court. The circuit court appropriately declined to issue an order regarding tax liability when such liability had not yet been determined by the IRS. We similarly decline to remand the issue of tax liability to the circuit court. However, our decision does not preclude either party from seeking a re-apportionment of tax liability after the IRS determination is complete.