IN RE the MARRIAGE OF:

Daniel R. TAYLOR, Petitioner-Respondent,

v.

Susan M. TAYLOR, Respondent-Appellant.

Court of Appeals

*No. 02–0118. Submitted on briefs May 13, 2002.—Decided September 26, 2002.*

2002 WI App 253

(Also reported in 653 N.W.2d 524.)

On behalf of the respondent-appellant, the cause was submitted on the briefs of *Michael D. Engleson* and *Gregg A. Auby* of *Auby & Engleson, LLC*, Sun Prairie.

On behalf of the petitioner-respondent, the cause was submitted on the brief of *Daniel W. Hildebrand* and *Nancy C. Wettersten* of *DeWitt Ross & Stevens, S.C.*, Madison.

Before Dykman, Deininger and Lundsten, JJ.

¶ 1. DEININGER, J. Susan Taylor appeals a circuit court order directing that the 35% share of a 401(k) plan awarded to her under a divorce property division be subject to a proportionate share of losses incurred by the plan following the date of divorce. Susan claims that she should receive a sum equal to 35% of the market value of the plan as of the date of her divorce from Daniel Taylor, without deduction for the losses which ensued. We conclude that under the unambiguous language of the parties' marital settlement agreement, Susan was awarded a 35% share of the plan as of the date of the divorce, and that Susan's share, like Daniel's, was subject to market gains and losses from that date until such time as she withdraws her share from the plan. Accordingly, we affirm the appealed order.

## BACKGROUND

¶ 2. Daniel and Susan were divorced on September 15, 2000. They entered into a marital settlement agreement on that date which was approved by the court and incorporated into the judgment of divorce. As a part of the property division set forth in the agreement, Daniel's 401(k) plan, consisting primarily of stocks, was divided between the parties. Daniel received "[s]ixty-five percent (65%) of his Madison National Life 401(k) plan, to be divided by Qualified Domestic Relations Order (QDRO)," and Susan received "[t]hirty-five

percent (35%) of Daniel's Madison National Life 401(k) plan, to be divided by QDRO."[1]

¶ 3. Some six months after the date of the divorce, Susan's counsel forwarded a draft QDRO to Daniel, to the trial court, and to the plan administrator for Daniel's 401(k) plan. Section III of the draft QDRO provided in part:

> The Plan Administrator . . . is hereby directed to divide [Daniel's] benefit . . . accrued as of September 15, 2000 ("the valuation date") as follows:
>
> A. The Plan Administrator shall determine the total value of [Daniel's] account under the Plan as of the date of valuation as defined under the terms of the Plan preceding the valuation date . . . .
>
> B. Thirty-five (35%) Percent of the value determined under paragraph (A) above shall be transferred to an account under [Susan's] name . . . and such account shall thereafter be separately administered until it is fully distributed. *There shall be no adjustment made to such transferred amount for changes in value of assets in [Daniel's] account under the Plan occurring after the valuation date through the date [Susan's]*

---

[1] The Employee Retirement Income Security Act of 1974, and various provisions of the Internal Revenue Code, generally prohibit individuals from assigning their benefits in qualified private retirement plans to another person. *Lindsey v. Lindsey*, 140 Wis. 2d 684, 689–90, 412 N.W.2d 132 (Ct. App. 1987). However, in the event of divorce, parties may assign such benefits through a qualified domestic relations order (QDRO), which is a judgment, decree, or order made pursuant to a state domestic relations law that authorizes payment of retirement benefits to a former spouse in order to satisfy child support, alimony, or marital property obligations. *See* I.R.C. § 414(p)(1).

*account . . . is actually established.*

(Emphasis added.) The draft QDRO also provided that Susan's account "shall be distributed to [her] in a cash lump sum as soon as administratively feasible after acceptance by the Plan Administrator of this Order."

¶ 4. Daniel wrote Susan's counsel and the trial court objecting to the emphasized language in Paragraph III-B of the draft QDRO. Daniel noted that the stock market had declined since the date of divorce, causing his 401(k) plan to lose value. Daniel contended that if Susan were to receive a "transferred amount" that did not reflect a proportionate share of the post-divorce losses, he would be penalized by "absorb[ing] the losses on both my portion of the 401(k) plan and Susan Taylor's as well." Daniel argued further that "[t]his would create a division of assets, which would give [Susan] a much larger share than the court ordered 35% share."

¶ 5. The trial court requested briefing on the issue. Susan argued that she was entitled to receive a sum in dollars equal to 35% of the value of the 401(k) plan as of the divorce date, with no adjustment for subsequent losses. Daniel responded that because Susan had agreed to a percentage of Daniel's 401(k) plan rather than a fixed dollar amount, her share (like his) was subject to fluctuations in market value until redeemed. He asserted that the actual dollar value of Susan's 35% share on the date of divorce "has no relevance . . . except to the extent that it was useful for purposes of determining what percentage was equitable as of the date of divorce."

¶ 6. The trial court agreed with Daniel, concluding that "[b]y opting to take a percentage of the 401(k) Susan could enjoy the benefits of an increase in the

294

value of the funds. At the same time, though, she had to assume the risk of a decrease in value." Accordingly, the court ordered that "Susan is entitled to 35% of the assets in Daniel's 401(k) on September 15, 2000, plus or minus any change in value attributable to those assets from that date until the creation" of the separate account for her share of the plan. Susan appeals, renewing her argument that her share of Daniel's 401(k) plan should consist of a sum equal to 35% of the dollar value of the plan as of the divorce date, without adjustment for subsequent losses.

## ANALYSIS

¶ 7. We generally review a trial court's decisions relating to the division of property between divorcing parties for the erroneous exercise of discretion. *Brandt v. Brandt*, 145 Wis. 2d 394, 406, 427 N.W.2d 126 (Ct. App. 1988). This appeal, however, requires us to interpret the language of a marital settlement agreement, which is "in the nature of a contract," the construction of which is a question of law we decide de novo. *Rosplock v. Rosplock*, 217 Wis. 2d 22, 30, 577 N.W.2d 32 (Ct. App. 1998). When the terms of a contract are unambiguous, we will construe the contract as it stands without examining extrinsic evidence to determine the intent of the parties. *Id.* at 31. The language of a contract or marital settlement agreement is ambiguous if it is reasonably susceptible to more than one meaning. *Id.* at 30.

¶ 8. We conclude the language at issue is not ambiguous. The property division section of the agreement, which was signed by the parties on the date of

their divorce, specifies that "the parties are awarded" the property thereafter enumerated for each. The itemization under the heading "To Daniel" includes "Sixty-five percent (65%) of his . . . 401(k) plan, to be divided by . . . (QDRO)." Similarly, among the items under the heading "To Susan" is "Thirty-five percent (35%) of Daniel's . . . 401(k) plan, to be divided by QDRO." The only reasonable interpretation of these provisions is that they grant Daniel a 65% share and Susan a 35% share of the 401(k) plan as of the date of the agreement and divorce.

¶ 9. Susan insists that the value of the 401(k) plan, and of her share in it, must be determined as of the date of the divorce, given the lack of "special circumstances" in this case. *See Schinner v. Schinner,* 143 Wis. 2d 81, 98, 420 N.W.2d 381 (Ct. App. 1988) ("[G]enerally the assets of a marriage are to be valued and divided as of the date of the divorce. Special circumstances can warrant deviation from this rule." (citation omitted)). We agree with Daniel, however, that the treatment of the 401(k) plan in this case fully comports with the general rule. It was "divided as of the date of the divorce," *id.*, based on its value at that time, in order to equalize the value of the parties' respective shares of the marital estate.

¶ 10. In support of her claim that she is entitled to receive a dollar sum equal to 35% of the value of the 401(k) plan on the date of the divorce, Susan relies on our disposition in *Schinner*, where we affirmed the trial court's award to a wife of a fixed sum from the husband's pension fund. *Id.* at 95–98. We note first, however, that *Schinner* did not involve the interpretation of a marital settlement agreement. We were called upon in that appeal to review a trial court's fact-finding and exercise of discretion following a trial on disputed

issues. *Id.* at 95. More importantly, we explained in *Schinner* that the wife specifically requested the court to award her the fixed sum which she established as being the dollar value of the pension fund at the time of trial. *Id.* at 97 (The "value was not in dispute at trial. It was this amount which [wife] requested be awarded to her by use of a QDRO . . . .").

¶ 11. Thus, our conclusion in *Schinner* that the trial court did not err in awarding the wife the fixed amount she requested from the pension fund, while ordering that all post-valuation-date earnings of the fund be awarded to the husband, *id.* at 98, would be of benefit to Susan only if she, too, had received a fixed sum from Daniel's 401(k) instead of a percentage share. But, as we have discussed, that is not the agreement that the parties reached. The trial court aptly described the circumstances in its written decision:

> Had [Susan] wanted to lock in a certain dollar figure, the parties could have agreed to that in their Marital Settlement Agreement . . . .
>
> Daniel's 401(k) was invested in a number of different funds. It is the nature of such investments that their value fluctuates. By opting to take a percentage of the 401(k) Susan could enjoy the benefits of an increase in the value of the funds. At the same time, though, she had to assume the risk of decrease in value.

¶ 12. "A court may not use the mechanism of construction to review an unambiguous contract in order to relieve a party from any disadvantageous terms to which the party has agreed." *Rosplock*, 217 Wis. 2d at 31. Nor may a court revise a divorce judgment with respect to a final property division. WIS. STAT. § 767.32(1)(a) (1999–2000) (providing that the court "shall not" revise or modify "the provisions of a

judgment or order with respect to final division of property"). Thus, although time may have proven Susan's acceptance of a percentage share of Daniel's 401(k) plan as an unfortunate choice, neither we nor the trial court are in a position to rewrite the agreement or the divorce judgment incorporating it in order to eliminate Susan's loss. Quite simply, in agreeing to accept a percentage share of a variable asset, Susan agreed to assume a proportionate share of any subsequent gains or losses until such time as she liquidates the asset.

¶ 13. Susan asserts in her reply brief that allocating a proportionate share of plan losses incurred after the divorce date to her share of the account "is against fairness, policy, and judicial efficiency." We disagree. Daniel actually lost more in dollar value from the post-divorce diminution of the 401(k) plan than did Susan, given that his post-divorce share of the plan was almost twice that of Susan's. We fail to see how "fairness" would be served by shielding Susan from any post-divorce decline in plan value, while imposing the entire loss on Daniel.

¶ 14. Moreover, we note that many assets that are awarded to one party or another, or are divided on a percentage basis at the time of a divorce, may fluctuate in value thereafter. We conclude that judicial economy would be ill-served by permitting any party who suffers a loss upon liquidation of an asset awarded to him or her in a divorce to seek a judicial reallocation of the loss. If a party desires the comfort and security of a fixed dollar sum from a divorce property division, that is what he or she should bargain for—or ask the court to order, as did the wife in *Schinner*. In short, we see no

equitable or policy reason why Susan should be relieved from the terms of the property division to which she agreed.

## CONCLUSION

¶ 15. For the reasons discussed above, we affirm the appealed order.

*By the Court.*—Order affirmed.