COURT OF APPEALS
DECISION
DATED AND FILED

September 4, 2019

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2018AP735**

STATE OF WISCONSIN

Cir. Ct. No. **2016FA540**

IN COURT OF APPEALS
DISTRICT III

IN RE THE MARRIAGE OF:

MAHMOUD ADEL SHARAF,

    PETITIONER-APPELLANT-CROSS-RESPONDENT,

V.

AMANDA KAY SHARAF,

    RESPONDENT-RESPONDENT-CROSS-APPELLANT.

APPEAL and CROSS-APPEAL from a judgment and an order of the circuit court for Eau Claire County: MICHAEL A. SCHUMACHER, Judge. *Judgment affirmed in part; reversed in part, and cause remanded for further proceedings. Order affirmed.*

Before Stark, P.J., Hruz and Seidl, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM.  Mahmoud and Amanda Sharaf divorced in 2017.[1] Mahmoud now appeals from the divorce judgment, as well as from a post-divorce order clarifying the judgment.  Mahmoud argues that the circuit court erred, in several respects, in its interpretation of the parties' prenuptial agreement (the Agreement).  Mahmoud also argues that the court erroneously exercised its discretion in setting his child support obligation.

¶2    Amanda cross-appeals from the judgment and order.  She argues that the circuit court erroneously exercised its discretion in determining the placement schedule for the parties' minor children.

¶3    We affirm the circuit court in all respects, save one.  Namely, we conclude that the circuit court's determination that the Agreement did not preclude an award of attorney's fees was in error.  Accordingly, we reverse the attorney's fees portion of the judgment, and we remand for further proceedings on that limited issue.

## BACKGROUND

¶4    The parties were married on December 27, 2013.  One month prior, they had entered into the Agreement.  Neither Mahmoud nor Amanda had been previously married.  They have two children:  twin boys born in 2015.

---

[1] For the sake of clarity, we refer to the parties individually by their first names for the remainder of this opinion.

¶5 In 2016, the parties filed for divorce. On November 9, 2017, the divorce was granted. At the time of the divorce, Mahmoud was forty-one years old and employed as a cardiologist in Sioux City, Iowa. His base salary was $525,000 per year, with approximately $100,000 in additional compensation available to him based on his on-call schedule. Amanda was thirty-nine years old and a homemaker residing in Eau Claire, Wisconsin. She had previously been employed as a pharmaceutical sales representative earning approximately $100,000 per year. Mahmoud and Amanda agreed that Amanda would not work outside of the home after the birth of their children.

¶6 Neither party disputed the validity or enforceability of the Agreement. However, they disputed the interpretation of several provisions within the Agreement. Primarily, this dispute centered on Amanda's argument that she was entitled to temporary maintenance and other financial support during the pendency of the divorce proceedings.

¶7 Specifically, Amanda requested monthly payments of "family support in the amount of $13,044.00 while this matter is pending." Moreover, she requested that Mahmoud deposit $5000 with her attorney's law firm as a retainer for legal services. Over Mahmoud's objection that these sums would violate the Agreement, the family court commissioner entered a temporary order that awarded Amanda $11,100 per month. This figure was comprised of $6600 for child support and $4500 for maintenance. An amended temporary order subsequently ordered Mahmoud to "provide attorney's fees in an amount equal to the amounts paid by [Mahmoud] to [his attorneys]."

¶8 After a final hearing, the circuit court entered a judgment granting the parties a divorce. The judgment required Mahmoud to pay Amanda $75,000

3

per year in maintenance for a period of five years, per the Agreement. The court declined to offset any of the family support payments or attorney's fees Mahmoud paid to Amanda during the pendency of the divorce against the maintenance award. In addition, the court rejected Mahmoud's argument that Amanda had forfeited her right to any maintenance by seeking more money than was provided for under the terms of the Agreement.

¶9 The judgment also required that the parties' marital residence be listed for sale. Regarding that sale, the circuit court ordered that "[p]ursuant to the [Agreement], the parties will share responsibility for renovation costs equally … the parties will equally share the responsibility for mortgage payments and utilities associated with the marital residence until sold."

¶10 The circuit court's judgment adopted the physical placement schedule for the parties' children that had been in effect since May of 2017. Specifically, the court ordered that the children would "spend one week with Mahmoud and his parents in Iowa and then spend 2 weeks in Eau Claire with [Amanda,]" on a continuous, alternating basis.

¶11 As to child support, the circuit court ordered Mahmoud to pay $7889 per month. The court relied on the child support guidelines[2] in ordering this amount, stating "this Court cannot find by the greater weight of the credible evidence that use of the 25 percent standard is unfair to the children or to any of the parties."

---

[2] *See* WIS. ADMIN. CODE ch. DCF 150 (June 2019).

¶12 Mahmoud subsequently moved the circuit court for "[c]larification as to whether [his] maintenance obligation is to be paid via monthly installments or an alternative method." As a result, the court entered a post-divorce order stating "the language in [the Agreement] provides for an annual maintenance payment of $75,000.00 and not a monthly obligation."

¶13 Mahmoud now appeals, challenging, as more fully explained below, those aspects of the circuit court's decision related to its interpretation of the Agreement and child support payments. Amanda cross-appeals, challenging the court's decision regarding physical placement of the parties' children.

## DISCUSSION

### I. Mahmoud's Appeal

#### A. Interpretation of the Agreement

¶14 A prenuptial agreement is a contract, and therefore its interpretation presents a legal question which we review de novo. *See Steinmann v. Steinmann*, 2008 WI 43, ¶21, 309 Wis. 2d 29, 749 N.W.2d 145. Our primary goal in interpreting a contract is to determine and give effect to the intent of the parties. *Id.* Accordingly, when the language of a contract is unambiguous, we will apply its literal meaning. *Id.* Further, when interpreting a prenuptial agreement, we adhere to the "basic rule of contract interpretation that a court 'cannot redraft the agreement, but must adopt that construction which will result in a reasonable, fair and just contract as opposed to one that is unusual or extraordinary.'" *Levy v. Levy*, 130 Wis. 2d 523, 531, 388 N.W.2d 170 (1986) (citation omitted).

¶15 Here, Mahmoud contends the circuit court erred in interpreting the Agreement by concluding that Amanda did not breach the Agreement when she

requested "more [financial support] than the Agreement provided." In the alternative, he argues that even if Amanda did not breach the Agreement, the court erred in awarding support because: (1) Amanda "released any and all claims" not provided for in the Agreement; (2) the Agreement did not allow for an award of "temporary maintenance" pending the divorce; (3) the amounts paid in temporary maintenance should have been offset against the $75,000 per year maintenance ordered to be paid upon divorce; (4) the order that Mahmoud contribute to Amanda's attorney's fees was contrary to the terms of the Agreement; (5) the order that Mahmoud share in the mortgage and utility expenses for the marital residence was contrary to the terms of the Agreement; and (6) the court should have ordered monthly, as opposed to annual, payments of maintenance. We address each of these arguments in turn.

### i. Amanda's Breach of the Agreement

¶16    Mahmoud first argues that Amanda "breached the Agreement and triggered the provision that voided the $75,000.00 [maintenance] payments as set forth in Paragraph 13." The specific provision of paragraph 13 that Mahmoud points to provides:

> **13. SUPPORT.**
>
> It is agreed, however, that in the event Wife should contest any of the terms of this Prenuptial Agreement *and* demand or claim more from the assets of Husband than allowed under this Prenuptial Agreement, then, in that event, the rights granted Wife under this Subsection shall immediately terminate and this Subsection shall become null and void.

(Emphasis added.) Mahmoud's argument that Amanda breached this provision hinges on his assertion that Amanda "repeatedly claimed, and in fact received,

6

more—notably the temporary maintenance, attorney fees, and mortgage and utility [payments]" than provided for in the Agreement.

¶17    We are not persuaded by this argument because, as noted by Amanda, the plain language of paragraph 13's penalty clause requires that two conditions must be met in order to trigger the clause.  This conclusion necessarily follows because the word "and" is a conjunctive which separates two requirements.  *See **State v. Lossman***, 118 Wis. 2d 526, 536, 348 N.W.2d 159 (1984).  As such, the "event" that must occur to trigger the penalty clause has two requirements:  (1) Amanda must "contest any of the terms" of the Agreement; and (2) she must demand or claim more from the assets of Mahmoud than allowed under the Agreement.

¶18    Mahmoud not only fails to develop an argument that Amanda did, in fact, contest the terms of the Agreement, he takes the opposite position on the first page of his brief-in-chief, stating: "Neither Party contested the validity or enforceability of the Prenuptial Agreement."  Because Amanda did not contest the terms of the Agreement, the first condition of the penalty provision did not occur.  Accordingly, we conclude that even if Amanda requested more than she ultimately was entitled to under the Agreement, she did not trigger the penalty clause.[3]  Rather, she merely argued for her own interpretation of the Agreement's terms instead of accepting Mahmoud's interpretation without question.  Because the penalty clause did not prohibit her from doing so, she did not breach the Agreement, and the maintenance provision was not voided.

---

[3] For reasons set forth below, we conclude that Amanda argued for, and received, more than she was entitled to under the terms of the Agreement in one respect—Mahmoud's contribution to her attorney's fees.

ii. Release of Claims

¶19 Mahmoud next argues that even if Amanda did not trigger the Agreement's penalty clause, she "specifically released any and all claims she may have had" for "temporary maintenance, attorney fees, and any other support not contemplated in the Agreement." In support, Mahmoud again relies on paragraph 13, which provides in relevant part:

> [I]n the event of a Decree of Legal Separation or a Decree of Marital Dissolution, then Husband shall pay and Wife shall accept as full and complete settlement of any and all claims against Husband the sum of seventy-five thousand dollars ($75,000) per year for a maximum of five years if the Parties have been married less than five years.

(Emphasis added.) To Mahmoud, the operative phrase in this excerpt is: "Wife shall accept as full and complete settlement of any and all claims against Husband [the relief set forth]."

¶20 We disagree with Mahmoud's interpretation as he ignores that the opening clause of the very sentence upon which he relies makes clear at what point Amanda released "any and all claims" against Mahmoud: "In the event of a Decree of Legal Separation or a Decree of Marital Dissolution[.]" The "claims" that Mahmoud faults Amanda for seeking all concerned payments made during the pendency of the divorce—i.e., before a decree of legal separation or marital dissolution was entered. Thus, we conclude Amanda did not "release" those claims under the terms of the Agreement.

iii. Temporary Maintenance

¶21     Mahmoud next argues that the court commissioner's award of family support during the pendency of the divorce was contrary to multiple provisions found in paragraph 12 of the Agreement.  The relevant provisions provide:

> **12.  DISPOSITION OF PROPERTY IN THE EVENT OF DIVORCE.**
>
> *In the event of the divorce or legal separation* of the Parties while both Parties are living, the Parties agree as follows:
>
>   ….
>
> (b) Neither Party need make any provisions for the other for community, marital, quasi-community or deferred marital property interests, alimony, support or maintenance payments except as otherwise stated herein, property or estate division or other rights, and both Parties agree to waive any right to receive such interests.
>
> (c) Each Party will retain his or her individual property and income.
>
>   ….
>
> (e) Neither Party shall have or acquire any right, title, claim or interest in or to the real or personal property or income of the other, and each shall hold all real or personal property which he or she may now or may hereafter own in his or her sole name and shall receive all income which he or she may now or hereafter be entitled to free from any claim or right by or of the other as though no marriage had ever taken place between them.  Both parties hereby mutually release and waive any and all right to receive alimony, support, or maintenance payments, except as otherwise stated herein, whether temporary or permanent, from the other ….

(Emphasis added.)

¶22     As an initial matter, we note that the plain language of paragraph 12 limits its application to after the "event of divorce" has occurred.  As discussed

above, the family support payments ordered by the commissioner took place prior to the finalization of the divorce. Still, Mahmoud argues that the paragraph "is not prefaced on waiting for a final judgment." As grounds, he asserts that "by definition temporary maintenance or support is that while the Parties are still married and the divorce is pending but not final." Based on that definition, he contends that the reference to "temporary maintenance" in paragraph 12 shows that its provisions apply during the entirety of the divorce proceedings.

¶23    We reject this argument because it is based on a false premise—namely, Mahmoud's limited definition of "temporary maintenance." Mahmoud cites to no legal authority restricting the definition of temporary maintenance to that maintenance paid while a divorce is pending but not final. To the contrary, as Amanda observes, our case law embraces a broader definition of temporary maintenance. Namely, we have employed the phrase "temporary maintenance" to refer to maintenance awards ordered for a limited duration, even after the event of a divorce has occurred. *See Roellig v. Roellig*, 146 Wis. 2d 652, 654, 431 N.W.2d 759 (Ct. App. 1988). Indeed, that is the exact type of maintenance that was awarded in this case upon the parties' divorce: $75,000 of annual maintenance for a temporary period of five years post-divorce.

¶24    Moreover, even if we embraced Mahmoud's position that paragraph 12 applied during the pendency of the parties' divorce, we conclude his argument that the commissioner's award of family support to Amanda during the divorce proceedings was in error still fails. This conclusion is based on the text of paragraph 12 providing that the "Parties hereby mutually release and waive any and all rights to receive alimony, support, or maintenance payments, *except as otherwise stated herein*[.]" (Emphasis added.)

10

¶25   The provision of the agreement that is "otherwise stated herein" is set forth in paragraph 5:

> **5. <u>COMMON EXPENSES – SUPPORT</u>.**
>
> Notwithstanding the foregoing paragraph [which provides for the individual treatment of the Parties' earnings during the marriage], the Parties agree that *during the period of time in which they are married to each other that they shall contribute* proportionately to the payments of all common household expenses in relationship to their asset ownership and income. Common household expenses shall include such items as rent or mortgage payments, property taxes on residences, property owners' insurance, maintenance expenses on residences, food, joint travel expense and *all other reasonable and necessary expenses for the joint maintenance of the Parties*. "All other reasonable and necessary expenses" shall not include clothing, jewelry and other personal items, personal care, entertainment and automobile expenses which shall be the individual responsibility of each party.

(Emphases added.) Mahmoud attempts to minimize the import of this section by arguing that once Mahmoud moved out of the parties' marital residence they no longer shared a "common household." In so arguing, he implicitly invites us to interpret "common" to modify the word "household" and to mean "held, enjoyed experienced, or participated in equally by a number of individuals." *See Common*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1993).

¶26   We decline Mahmoud's invitation. Instead, we interpret the Agreement's use of "common" to mean "characteristic of a usual type or standard … quite usual or average[.]" *See id.* Such an interpretation is in accord with the types of household expenses listed in the Agreement—i.e., standard expenses such as rent, food, travel, maintenance, taxes and insurance. And, nothing in the Agreement provides the parties must share a household in order to be responsible to share in the cost of their household expenses.

¶27    Moreover, our interpretation adheres to the basic rule that we must interpret a prenuptial agreement in a manner that is reasonable, fair and just. *See Levy*, 130 Wis. 2d at 531. To explain, if we accepted Mahmoud's interpretation of the Agreement, then Amanda—who, pursuant to the parties' agreement that she stay home with the children, had no independent income during the marriage or during the pendency of the divorce—would be left without any money for mortgage payments, maintenance of the residence, food, travel, and other reasonable and necessary expenses based solely on Mahmoud's decision to move out of their shared household. Such a result would be both extraordinary and unusual, and we decline to adopt it. *Id.*

### iv. Offset

¶28    Mahmoud next argues that "[i]t was error not to offset amounts paid in temporary maintenance." He reasons that "[b]ecause the $54,000.00 in temporary maintenance payments [that he was ordered to pay] were contrary to the Agreement, [Amanda] should be required to pay them back." For the reasons just explained, the family support payments Mahmoud paid to Amanda during the pendency of the divorce were not contrary to the terms of the Agreement. Therefore, the underpinning of Mahmoud's argument for an offset lacks merit.

### v. Attorney's Fees

¶29    Mahmoud also argues that the circuit court's order that he contribute to Amanda's attorney's fees was contrary to the terms of the Agreement. He relies upon the fact that although the Agreement did not explicitly address the issue of attorney's fees, it did provide that the parties are responsible for their individual debts. This responsibility is outlined in paragraph 9:

**9.  PAYMENT OF DEBTS AND LIABILITIES.**

Each Party shall assume and pay out of his/her individual property without any obligation or liability on the part of the other therefor the following liabilities:

....

(b)  All debts, obligations, taxes, assessments and expenses at any times incurred, arising, existing or relating to the acquisition, holding, disposition, operation, management or administration of his/her individual property[.]

….

Notwithstanding the foregoing paragraph, either Party may voluntarily contribute toward the payment of the individual liabilities of the other.

¶30     We conclude that, under this paragraph, Mahmoud is correct that an award of attorney's fees is contrary to the terms of the Agreement.  Our supreme court has long held that, in a divorce action, one spouse's attorney's fees are a debt solely attributable to that spouse.  *See **O'Connor v. O'Connor***, 48 Wis. 2d 535, 540, 180 N.W.2d 735 (1970).  As the clear intent of the parties under paragraph 9 was to make each party responsible for their own debts, we therefore conclude that the circuit court erred in ordering Mahmoud to contribute toward Amanda's attorney's fees.

¶31     Amanda advances two arguments against this conclusion.  First, she contends that attorney's fees may be considered a common household expense, thereby making them payable under paragraph 5.  We are not persuaded.  As we have explained, paragraph 5 clearly applies to common household expenses—that is, those expenses that are usual or standard expenses incurred by a household. We do not consider attorney's fees to be such a usual or standard expense, and Amanda provides no citation to any legal authority that would suggest an opposite conclusion.

¶32 Second, Amanda argues that paragraph 10 of the Agreement may entitle her to attorney's fees. That paragraph provides, in part:

**10. DISPOSITION OF PROPERTY TO OTHER PARTY.**

Notwithstanding any other provision of this Agreement, either Party may by appropriate written instrument transfer, gift, convey, devise or bequeath any property to the other.

Amanda contends that "[n]othing in paragraph 10 states that the transfer of property must be voluntarily made. Therefore, an appropriate written instrument—such as a court order—can require Mahmoud to transfer property to Amanda during the marriage."

¶33 Again, we are unpersuaded. First, the provision states a "Party may … transfer," which clearly implies a voluntary transfer, and a court-ordered payment can hardly be considered a voluntary transfer. Second, to hold that a court order could be considered an "appropriate written instrument" by which one spouse could involuntarily "gift" or "transfer" property to another would lead to an absurd result: the effective evisceration of all other provisions in the Agreement. Just as we declined to adopt Mahmoud's extraordinary interpretation of paragraph 5, so too do we decline to adopt Amanda's extraordinary interpretation of paragraph 10.[4] *See Levy*, 130 Wis. 2d at 531.

---

[4] We observe that, generally, a circuit court has the discretion to order either party to contribute to the other party's litigation costs and attorney's fees in a family action under WIS. STAT. § 767.241(1) (2017-18). *See Johnson v. Johnson*, 199 Wis. 2d 367, 377, 545 N.W.2d 239 (Ct. App. 1996). However, Amanda does not develop any argument that this discretionary authority survives a prenuptial agreement where—like here—the terms of the agreement prohibit an award of attorney's fees. Nor are we aware of any legal authority for such a proposition. In addition, we note that Amanda does not argue that our concluding the terms of the Agreement prohibit an award of attorney's fees would be inequitable. Indeed, she expressly acknowledges

(continued)

### vi. Mortgage and Utility Payments

¶34 Mahmoud next contends that the circuit court erred by ordering him to "equally share the responsibility for mortgage payments and utilities" while the sale of the parties' marital residence was pending. In this instance, his argument concerns the text of paragraph 16 of the Agreement, which reads:

> **16. PURCHASE OF RESIDENCE.**
>
> The Parties contemplate that they will in the future purchase a residence. The Parties shall hold title to the residence, and all furniture, tools, equipment, fixtures, and miscellaneous household items of the residence, as marital property regardless of the source of the funds used to purchase the same. The Parties shall have equal rights to the control, management and use of the residence and share the responsibilities for the same.

Mahmoud concedes that the court's order may appear consistent with this language at "first glance." Nevertheless, he asserts that the court erred because the intent of the parties under paragraph 16 was that "expenses and responsibilities [related to the marital residence] are equal because, or while, the rights of control, management and use of the residence are also equal." Based on this assertion, he contends that after the January 2017 temporary order granted Amanda the sole use of the marital residence, "then the condition for sharing the expenses [for the marital residence] was removed. When the stated condition … for sharing expenses was removed, then the responsibility for sharing expenses … was likewise removed."

---

that she has "consistently argued that the terms of the prenuptial agreement be applied … [and that on appeal she] is not contesting the terms of the prenuptial agreement."

All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

¶35   We reject Mahmoud's argument.   The plain language of paragraph 16 establishes two requirements regarding the marital residence— namely, each party shall:  (1) have equal rights to the control, management and use of the residence; and (2) share the responsibilities for the same.  *See **Lossman***, 118 Wis. 2d 526 at 536.   There is no language in the paragraph that makes one requirement contingent upon the other, and we may not rewrite a prenuptial agreement to give it a meaning not agreed to by the parties.  ***Taylor v. Taylor***, 2002 WI App 253, ¶12, 258 Wis. 2d 290, 653 N.W.2d 524.

¶36   As Amanda aptly notes, the parties could have readily included a provision in the Agreement that embodied the interpretation Mahmoud now offers to us.  For example, paragraph 16 could have said:  "The Parties shall share the responsibilities for the residence if they have equal rights to the control, management and use of the residence."  But the parties did not do so, and, as indicated, we cannot revise their agreed-upon terms.  *See **id.***  Consequently, we determine that regardless of whether the January 2017 temporary order affected Mahmoud's use of the marital property, the requirement that he share in the responsibility for the residence remained.[5]

¶37   Mahmoud also argues that our interpretation of paragraph 16 is inconsistent with our interpretation of the "breach" provision of paragraph 13 because it requires us to give the word "and" two different meanings.  We disagree.  In both paragraphs, we have interpreted the Agreement's use of the conjunctive "and" to set forth two requirements.   What Mahmoud fails to

---

[5] Mahmoud does not raise any arguments concerning the propriety of the January 2017 temporary order's restriction on his use of the marital residence.

recognize, and what differentiates the two paragraphs, is that paragraph 13 set forth two requirements that had to be satisfied in order to trigger a further action: the immediate termination of the obligation at issue. Stated differently, paragraph 13 used the conjunctive "and" to delineate two conditions precedent. Conversely, in paragraph 16, the two requirements are not conditions precedent to anything. Rather, they are standalone requirements setting forth the parties' obligations under the Agreement.

### vii. Timing of Maintenance Payments

¶38 Finally, Mahmoud argues that the circuit court erred by ordering that he pay his $75,000-per-year maintenance obligation in an annual lump sum, as opposed to on a monthly basis. Once again, the relevant language is found in paragraph 13 and states:

> In the event of … a Decree of Marital Dissolution, then Husband shall pay and Wife shall accept as full and complete settlement of any and all claims against Husband the sum of seventy-five thousand dollars ($75,000) *per year* for a maximum of five years if the Parties have been married less than five years. If the Parties have been married more than five years and the Wife is out of the work force in order to care for children of the marriage, then Husband shall pay Wife $100,000 per year for a maximum period of ten years ("Payment Period"). … If during the Payment Period, the Wife becomes employed, then any *annual payment* to Wife shall be reduced by an amount equal to the annual salary of Wife during such period.

(Emphases added.)

¶39 The Agreement plainly provides that Mahmoud's maintenance obligation, based upon the parties' less-than-five-year marriage, is $75,000 per year for five years. However—and despite Amanda's argument that the use of the

17

phrase "per year" unambiguously establishes a once yearly payment for five years[6]—the Agreement does not explicitly provide for whether the maintenance payments should be made on an annual or different basis.

¶40    Still, the Agreement calls for an "annual payment" of maintenance, albeit for maintenance payments that were triggered by a marriage of more than five years.  Even though those payments were not triggered, we find the use of the phrase "annual payment" instructive, because the meaning of a particular provision in a contract must be ascertained in reference to the contract as a whole.  See *MS Real Estate Holdings, LLC v. Donald P. Fox Family Tr.*, 2015 WI 49, ¶38, 362 Wis. 2d 258, 864 N.W.2d 83.

¶41    With that principle in mind, we conclude that the Agreement's reference to maintenance payments of $75,000 "per year" is properly interpreted as calling for annual payments.  In fact, there is no language in the Agreement that suggests monthly payments, or any other contrary payment schedule, would be proper.[7]

---

[6] To explain, any number of different payment schedules—i.e., weekly, biweekly, monthly, or annually—could easily be instituted and structured to result in $75,000 being paid per year by simply dividing the total sum by the total number of payments.

[7] Mahmoud makes a cursory argument that he would lose the "ability to stop or reduce payment at a triggering event" if the maintenance payments are made annually, as opposed to monthly.  This argument fails, however, because the plain language of the Agreement does not provide for any "triggering event" that cuts short maintenance payments made pursuant to a divorce after a marriage of less than five years—only a divorce following a marriage of more than five years provides for possible early termination of maintenance payments.

*B. Child Support*

¶42    Mahmoud next argues the circuit court erroneously exercised its discretion in setting his child support obligation. The setting of child support is entrusted to the sound discretion of the circuit court and will not be disturbed on review absent an erroneous exercise of that discretion. ***Randall v. Randall***, 2000 WI App 98, ¶7, 235 Wis. 2d 1, 612 N.W.2d 737. We will uphold a circuit court's discretionary decision if the court examined the relevant facts, applied a proper standard of law, and used a demonstrated rational process to reach a reasonable conclusion. ***Id.*** Although the proper exercise of discretion contemplates that a court explain its reasoning in setting child support, we may search the record to determine if it supports the court's discretionary decision. ***Id.***

¶43    When a circuit court sets child support in accordance with the applicable guidelines, it is presumed that the court's determination is fair. ***Ladwig v. Ladwig***, 2010 WI App 78, ¶23, 325 Wis. 2d 497, 785 N.W.2d 664. In order to deviate from the applicable percentage standard, the court must find by the greater weight of the credible evidence that the use of the standard would be unfair to either the child or the party requesting deviation. ***Id.*** In determining fairness, the court must consider the factors enumerated under WIS. STAT. § 767.511(1m). ***Ladwig***, 325 Wis. 2d 497, ¶23.

¶44    Here, Mahmoud does not dispute that the circuit court set his child support obligation in accordance with the applicable child support guidelines, as presumptively required by WIS. STAT. § 767.511(1j). Rather, he argues that the court erroneously exercised its discretion because it did not adequately explain its decision not to deviate from the guidelines.

¶45    In its written findings of fact and conclusions of law, the circuit court began its discussion of child support by articulating Mahmoud's closing argument as to why the guideline child support figure ($7889 per month) would be unfair.  The court wrote:

> Mahmoud believes that any child support in excess of $3,000 a month would be excessive.  He testified that the parties spent about $1,572 per month on typical living expenses for the entire household.  He points out that the family did not live a lavish lifestyle rather a comfortable and modest one.

After summarizing Amanda's arguments, the court then listed the WIS. STAT. § 767.511(1m) factors and stated that, "having considered" them, "this Court cannot find by the greater weight of the credible evidence that use of the 25 percent standard is unfair to the children or to any of the parties."

¶46    Although we recognize that the circuit court did not explicitly apply the facts of this case to the statutory factors it found relevant, we nonetheless conclude that the court's determination was not an erroneous exercise of its discretion.  To explain, by framing his unfairness argument in terms of the family's monthly expenses and lifestyle, Mahmoud implicitly invoked only WIS. STAT. § 767.511(1m)(c), which directs a court to consider "[i]f the parties were married, the standard of living the child would have enjoyed had the marriage not ended in annulment, divorce or legal separation."

¶47    On this record, there is more than ample support for the circuit court's rejection of Mahmoud's position regarding that statutory factor.  For example, while Mahmoud asserted that the family's typical monthly expenses were $1572, Amanda submitted financial declarations showing that she and the children had monthly expenses of $13,044.37 in November of 2016 and

$11,385.55 in October of 2017. These figures corresponded to Mahmoud's own earlier-submitted financial declarations, which listed the family's monthly expenses at: $10,865 in November of 2016; $9630 in June of 2017; and $9750 in October 2017.

¶48 Given the great discrepancy between the monthly expense figures in the parties' financial declarations—none of which Mahmoud disputes on appeal—and Mahmoud's position regarding the family's standard of living in his closing argument, we cannot conclude that the circuit court erroneously exercised its discretion. To the contrary, we agree with the court that Mahmoud failed to prove by the greater weight of the credible evidence that the standard of living the children enjoyed during the marriage was a factor that weighed in favor of finding unfairness in applying the guideline amount. As Mahmoud failed to develop any other argument as to why the applicable child support guidelines were unfair, we will not disturb the court's application of that presumptively fair standard. *See Ladwig*, 325 Wis. 2d 497, ¶23.[8]

## II. Amanda's Cross-Appeal

¶49 In her cross-appeal, Amanda argues the circuit court erroneously exercised its discretion in determining the children's physical placement schedule. A circuit court has broad discretion in making physical placement decisions. *Lofthus v. Lofthus*, 2004 WI App 65, ¶16, 270 Wis. 2d 515, 678 N.W.2d 393.

---

[8] Although we affirm the circuit court's exercise of its discretion solely on the basis explained above, we note that the court also invoked WIS. STAT. § 767.511(1m)(hm), the "best interests of the child" factor, in explaining why its child support determination was fair. Specifically, the court wrote that "[t]his Court is of the opinion that Amanda will appropriately make use of the child support payments for the benefit of the children. Indeed, the children deserve to benefit from the significant earning capacity of their father."

Consequently, we must give great weight to the court's determination, and we will sustain its exercise of discretion as long as the court considered the facts of record in light of the proper legal standard and reached a reasonable conclusion. *Wolfe v. Wolfe*, 2000 WI App 93, ¶17, 234 Wis. 2d 449, 610 N.W.2d 222.

¶50 In the circuit court, the children's guardian ad litem (GAL) submitted a physical placement recommendation that called for Amanda to move to the Twin Cities, where "Mahmoud [would] have placement every other weekend in the Twin Cities while he is not working. … He should also have placement one week during the month of June and July[.]" Amanda joined this recommendation. Mahmoud, in turn, argued for an "alternating two week/two week schedule."

¶51 The circuit court ultimately declined to adopt either party's recommendation. Instead, it adopted the physical placement schedule recommended by Dr. Anton Smets, a psychologist initially hired by Amanda to perform a custody study.[9] In doing so, the court identified and analyzed, at length, all sixteen statutory factors relevant to the best interests of the children, as required by WIS. STAT. § 767.41(5)(am).

¶52 Amanda now argues that circuit court "erred by rejecting the [GAL's] recommendation." In support, she provides an extensive recitation of the

---

[9] Doctor Smets completed a custody study after conducting: (1) an individual meeting with Amanda; (2) a telephone interview with Mahmoud; (3) an in-home visit with Amanda and the children in Eau Claire; (4) an in-home visit with Mahmoud and the children in Sioux City; and (5) various other meetings and interviews. Ultimately, Dr. Smets produced a lengthy, twenty-four page report in which he recommended that the children be placed on a one week/two week rotation schedule, consistent with the schedule that had been in place by court order since May of 2017.

facts of the case and makes various arguments attacking the credibility of Dr. Smets and crediting the testimony of a second expert she retained, Dr. Kip Zirkel.[10]

¶53     The problem with Amanda's argument is that it ignores our standard of review.  Regardless of whether there was evidence that supported the GAL's recommendation, the circuit court was entitled to rely on the report and recommendation of Dr. Smets, because the weight and credibility of expert witness testimony are matters uniquely within the province of the fact finder—here, the circuit court.  *See **Bloomer Housing Ltd. P'ship v. City of Bloomer***, 2002 WI App 252, ¶12, 257 Wis. 2d 883, 653 N.W.2d 309.  Doctor Smets' recommendation was not incredible as a matter of law, and the court therefore had a right to rely upon it.  We see no reason to disturb the court's discretionary decision.

## CONCLUSION

¶54     In summary, we affirm the circuit court in all respects, save one. Namely, we conclude the circuit court's determination that the Agreement did not preclude an award of attorney's fees was in error.  Accordingly, we reverse the attorney's fees portion of the judgment, and we remand for further proceedings on that limited issue.

---

[10] Doctor Zirkel, a child adolescent psychologist, did not perform a custody study in this case.  Instead, as the circuit court found, he performed a single interview with Amanda, "talked in general about a variety of topics and how they may impact upon children," and "critiqued the evaluation done by Dr. Smets, but offered no opinion about placement of" the parties' children.

*By the Court.*—Judgment affirmed in part; reversed in part, and cause remanded for further proceedings. Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.