COURT OF APPEALS
DECISION
DATED AND FILED

June 22, 2023

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP979**

Cir. Ct. No. 2017FA1533

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT IV

IN RE THE MARRIAGE OF:

RONALD H. HELLENBRAND, JR.,

PETITIONER-APPELLANT,

V.

VICKI VOGEL HELLENBRAND,

RESPONDENT-RESPONDENT.

APPEAL from an order of the circuit court for Dane County: SARAH B. O'BRIEN, Judge. *Reversed and cause remanded with directions.*

Before Kloppenburg, Fitzpatrick, and Graham, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM.  Ronald Hellenbrand, Jr. ("Ron") appeals an order of the Dane County Circuit Court denying his motion requesting the court to order his ex-wife, Vicki Vogel Hellenbrand ("Vicki"), to resume Section 71 payments pursuant to the terms of their Partial Marital Settlement Agreement ("PMSA").[1] According to that agreement, Vicki's obligation to make Section 71 payments ceases if Ron's family's farm is sold and Ron has "the right to receive at least $280,000 in funds from the sale."  When the farm was eventually sold, some of the funds from the sale were deposited in the Hellenbrand Family Trust ("the Family Trust") of which Ron and his brother, Troy Hellenbrand ("Troy"), were cotrustees. Troy then distributed all those funds to their mother, and Ron petitioned a circuit court to void that distribution.  Ron was offered $356,000 of those funds to settle the distribution dispute, but Ron declined to accept the offer.

¶2     Vicki then stopped making Section 71 payments to Ron, asserting that the settlement offer in the Family Trust litigation gave Ron the "right to receive" at least $280,000 in funds from the sale of the farm.  The circuit court agreed and denied Ron's motion to resume the Section 71 payments.  On appeal, Ron argues that he had no "right" to receive the funds via the settlement offer because that offer was premised on Troy's unauthorized distribution of the funds from the Family Trust.  We agree and conclude that Troy's distribution of the funds was unauthorized because Troy's distribution to Judith was contrary to the terms of the Family Trust which permits such a distribution only as necessary for

---

[1] Section 71 refers to a former section of the Internal Revenue Code relating to alimony and separate maintenance payments.  *See* 26 U.S.C. § 71 (2012).

In addition, we refer to the parties and Ron's family members by their first names because each shares a surname.

Judith's health, support, and maintenance.[2]  Therefore, we reverse and remand to the circuit court with directions to order Vicki to pay Section 71 payments due from August 18, 2021, as required by the PMSA, and for other relief consistent with this opinion.

## BACKGROUND

¶3      There is no dispute as to the following material facts.

¶4      Ron and Vicki divorced in 2018 and entered into the PMSA which was approved by the circuit court.  In the PMSA, Vicki agreed to make Section 71 payments to Ron for at least three years.  Vicki further agreed that, after the three-year mark, she will continue to make these payments for another two years except in certain circumstances.  As pertinent here, the PMSA provides that Vicki's obligation to make these payments ceases if Ron has the right to receive at least $280,000 from the sale of the Hellenbrand family farm ("the Family Farm"):

> If Vicki has not retired within the 3-year guaranteed payment period, she shall continue [Section 71 payments] for up to an additional 2 years as long as she is working. The Section 71 payments [will] cease at the earlier of the 2 years or … if all or a portion of the [Family Farm] is sold *and Ron has the right to receive* at least $280,000 in funds from the sale.

(Emphasis added.)

---

[2] Ron also argues that Troy's distribution of the funds to Judith was unauthorized because Troy unilaterally distributed the funds without the consent of Ron, the cotrustee. However, we need not address that issue because the issue we address is dispositive. *See Barrows v. American Fam. Ins. Co.*, 2014 WI App 11, ¶9, 352 Wis. 2d 436, 842 N.W.2d 508 (2013) ("An appellate court need not address every issue raised by the parties when one issue is dispositive.").

¶5      At the time the PMSA was executed, the Family Farm was owned entirely by the Family Trust and Judith Hellenbrand ("Judith"), Ron and Troy's mother.  The Family Trust is a testamentary trust that was created through the will of Ron and Troy's father, Ronald Hellenbrand, Sr. ("Ron Sr."), and its terms are relevant to this appeal.

¶6      Assuming Judith survives and property is added to the Family Trust, Ron Sr.'s will directs that this property must be distributed as follows:

> All the net income of this trust shall be distributed to [Judith] at convenient intervals but at least quarterly in each year, as long as she lives and regardless of whether she may remarry.
>
> In addition, my trustee acting alone is authorized, in his discretion and at such times as he deems proper during the life [of Judith], to distribute to [Judith] such of the principal of this trust as such trustee deems necessary for the health, support and maintenance of [Judith], having in mind the standard of living to which she was accustomed at the time of my death.

(Paragraph numbering omitted.)  Ron and Troy were designated by Ron Sr. in the will as cotrustees of the Family Trust.  Under the terms the will, all of Ron Sr.'s property, including his interest in the Family Farm, passes to Judith.  However, Ron Sr.'s will did not initially fund the Family Trust.  Rather, Ron Sr.'s will authorizes Judith to "disclaim or renounce" any portion of the interest that passes to her, and if Judith decides to disclaim or renounce any interest, then that interest is added to the Family Trust.

¶7      Ron Sr. died in 2007.  As a result, all his property, including his interest in the Family Farm, passed to Judith.  However, as allowed by the terms of Ron Sr.'s will, Judith disclaimed a 17.88% interest in the Family Farm, and that

interest was added to the Family Trust. At that time, the interest in the Family Farm was the sole asset in the Family Trust.

¶8   In March 2020, the Family Farm was sold. As a result, the Family Trust received 17.88% of the sale proceeds, which amounted to approximately $712,000. In December 2020, on the advice of his attorney but without Ron's express consent, Troy transferred to Judith all of the funds in the Family Trust from the proceeds of the sale of the Family Farm.

¶9   In March 2021, Ron filed a petition in the Dane County Circuit Court naming himself, Troy, and Judith as interested persons. In the petition, Ron asserted that Troy lacked the authority to distribute the funds in the Family Trust and requested that the court enter an order voiding the previous distribution of funds Troy transferred to Judith.

¶10   In the spring of 2021, Judith offered to settle the dispute with Ron. Specifically, Judith offered to Ron half of the amount that she had received from the Family Trust (approximately $356,000) in exchange for Ron's dismissal of the petition.[3] Ron did not accept Judith's offer. In September 2021, Ron, Troy, and Judith entered into a "nonjudicial settlement" pursuant to WIS. STAT. § 701.0111 (2021-22)[4] in which Judith agreed to return all $712,000 to the Family Trust, and Ron agreed to dismiss his petition.

---

[3] The parties do not dispute that the funds mentioned in the offer were to come from the Family Trust funds, not Judith's personal funds.

[4] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

¶11     Starting in August 2021, Ron stopped receiving Section 71 payments from Vicki. Ron requested that Vicki resume payments, but Vicki did not do so. Ron then filed a motion in the circuit court requesting that the court order Vicki to resume payments. In response, Vicki argued that she was not obligated to continue making Section 71 payments under the PMSA because the Family Farm was sold and Judith's settlement offer of $356,000 in the Family Trust litigation gave Ron a "right to receive" at least $280,000 in funds from that sale.

¶12     The circuit court agreed with Vicki and denied Ron's motion, reasoning that Judith's settlement offer gave Ron the right to receive at least $280,000 from the proceeds of the sale of the Family Farm. Ron appeals the circuit court's order.

¶13     Additional material facts are mentioned in the following discussion.

## DISCUSSION

¶14     On appeal, the parties dispute whether Judith's settlement offer of $356,000 gave Ron a right to receive funds from the sale of the Family Farm as contemplated by the PMSA. We begin by setting forth governing principles and our standard of review regarding the interpretation of marital settlement agreements and testamentary trusts.

### I. Governing Principles and Standard of Review.

¶15     This appeal requires us to interpret the language of the PMSA. The interpretation of a marital settlement agreement involves contract interpretation, which is a question of law that we review de novo. *Taylor v. Taylor*, 2002 WI App 253, ¶7, 258 Wis. 2d 290, 653 N.W.2d 524. Our primary goal in contract interpretation is to "give effect to the parties' intent, as expressed in the

contractual language." ***Maryland Arms Ltd. P'ship v. Connell***, 2010 WI 64, ¶22, 326 Wis. 2d 300, 786 N.W.2d 15. "We presume the parties' intent is evidenced by the words they chose, if those words are unambiguous." ***Tufail v. Midwest Hosp., LLC***, 2013 WI 62, ¶26, 348 Wis. 2d 631, 833 N.W.2d 586.

¶16 "The general rule as to construction of contracts is that the meaning of particular provisions in the contract is to be ascertained with reference to the contract as a whole." ***MS Real Est. Holdings, LLC v. Donald P. Fox Fam. Tr.***, 2015 WI 49, ¶38, 362 Wis. 2d 258, 864 N.W.2d 83. We interpret the language of a contract "according to its plain or ordinary meaning, … consistent with 'what a reasonable person would understand the words to mean under the circumstances.'" ***Id.***, ¶37 (citation omitted). In other words, "[w]e interpret contracts to give them common sense and realistic meaning." ***Id.***, ¶38 (internal quotation marks omitted).

¶17 When the terms of a contract are unambiguous, we interpret the contract according to its literal terms without examining extrinsic evidence to determine the intent of the parties. ***Taylor***, 258 Wis. 2d 290, ¶7. "Only when the contract is ambiguous, meaning it is susceptible to more than one reasonable interpretation, may the court look beyond the face of the contract and consider extrinsic evidence to resolve the parties' intent." ***Town Bank v. City Real Est. Dev., LLC***, 2010 WI 134, ¶33, 330 Wis. 2d 340, 793 N.W.2d 476. Whether a contract is ambiguous is a question of law that this court decides de novo. ***Rosplock v. Rosplock***, 217 Wis. 2d 22, 30, 577 N.W.2d 32 (Ct. App. 1998).

¶18 This appeal also requires us to interpret the language of the Family Trust that was created through Ron Sr.'s will. The interpretation of a testamentary instrument is a question of law that we review de novo. ***McGuire v. McGuire***,

2003 WI App 44, ¶10, 260 Wis. 2d 815, 660 N.W.2d 308. Our interpretation of a will begins with the language of the will because that is the best evidence of the testator's intent. ***Lohr v. Viney***, 174 Wis. 2d 468, 480, 497 N.W.2d 730 (Ct. App. 1993). "[I]f there is no ambiguity or inconsistency in the will's provisions, there is no need for further inquiry into the testator's intent." ***Id.***

## II.  Meaning of the Phrase "Right to Receive" in the PMSA.

¶19     The first issue in this appeal concerns the meaning of the phrase "right to receive" as used in the PMSA. To repeat, the PMSA states that Vicki's obligation to make Section 71 payments ceases if "all or a portion of the [Family Farm] is sold and Ron has the *right to receive* at least $280,000 in funds from the sale." (Emphasis added.)  Ron argues that the phrase "right to receive" is not ambiguous and refers to his "legal" right to receive funds. We agree. The ordinary or plain meaning of the word "right" is a "power, privilege, or immunity secured to a person by law." *Right*, BLACK'S LAW DICTIONARY (11th ed. 2019). Accordingly, pertinent to the present circumstances, the PMSA requires that Ron obtain the legal power or authority to receive at least $280,000 in funds from the sale of the Family Farm for Vicki's payment obligation to terminate.  This interpretation of the PMSA is reasonable and gives the provision "common sense and realistic meaning." *See **MS Real Est. Holdings***, 362 Wis. 2d 258, ¶38 (internal quotation marks omitted).

¶20     In contrast, Vicki argues that, in this provision of the PMSA, the word "right" has a different meaning.  Vicki points to dictionary definitions and contends that the word "right" in this context merely refers to a claim or entitlement that is proper or morally justified. *See, e.g.*, *Right*, Merriam-Webster Dictionary,    https://www.merriam-webster.com/dictionary/right    (last    accessed

June 13, 2023) (defining "right," in part, as "something that one may properly claim as due"). We are not persuaded.

¶21 "The mere fact that a word has more than one dictionary meaning, or that the parties disagree about the meaning, does not necessarily make the word ambiguous if the court concludes that only one meaning applies in the context and comports with the parties' objectively reasonable expectations." *Sprangers v. Greatway Ins. Co.*, 182 Wis. 2d 521, 537, 514 N.W.2d 1 (1994). Under Vicki's interpretation of the word "right," her obligation to make Section 71 payments would cease if Ron in some sense "deserved," or was morally entitled to, $280,000 in proceeds from the sale of the Family Farm. This interpretation is untenable because it injects subjective moral determinations into the interpretation of the PMSA. Vicki's interpretation is untethered to a discernable standard and undermines the predictability of the parties' contractual obligations. In other words, Vicki's reading of that phrase in the PMSA is not consistent with "what a reasonable person would understand the words to mean under the circumstances." *MS Real Est. Holdings*, 362 Wis. 2d 258, ¶37.

¶22 In sum, this provision of the PMSA is triggered only if Ron is legally empowered or legally entitled to receive at least $280,000 in proceeds from the sale of the Family Farm.

### III. Ron Did Not Have the Right to Receive Funds From Judith's Settlement Offer.

¶23 The second issue is whether Judith's settlement offer gave Ron the right to receive at least $280,000 from the proceeds of the sale of the Family

Farm.⁵ Ron argues that Judith's settlement offer did not give him that right because the offer was premised upon Troy's "wrongful distribution" of trust funds to Judith. Specifically, Ron argues that Troy acted outside his limited discretionary authority to distribute funds as set forth in the following language from Family Trust:

> [M]y trustee acting alone is authorized, in his discretion and at such times as he deems proper during the life of [Judith], to distribute to [Judith] such of the principal of this trust *as such trustee deems necessary for the health, support and maintenance of [Judith]*, having in mind the standard of living to which she was accustomed at the time of my death.

(Emphasis added.) We agree and conclude that Troy acted outside the authority granted by the terms of the Family Trust which permits the distribution of funds only if necessary for Judith's health, support, and maintenance. We begin by setting forth governing principles regarding a trustee's discretionary authority and the meaning of the terms highlighted immediately above.

¶24 When discretion is conferred upon a trustee with respect to the exercise of a power, the trustee must exercise that discretionary power "in good faith and in accordance with the terms and purposes of the trust." WIS. STAT. § 701.0814(1). However, "[t]he discretion of trustees is not absolute and unlimited," and a court may "interfere" with a trustee's discretionary decision if that decision amounts to an "abuse of discretion." *Filzen v. Headley*, 252 Wis. 322, 325-26, 31 N.W.2d 520 (1948); *see also La Bonde v. Weckesser*, 265 Wis. 641, 646, 62 N.W.2d 561 (1954) (citing RESTATEMENT (FIRST) OF TRUSTS § 187

---

⁵ The parties agree that the only dispute is whether Ron had the right to receive proceeds from the sale of the Family Farm because of Judith's settlement offer, not because of any right to receive a direct distribution of funds from the Family Trust.

(AM. L. INST. 1935)). One way that a trustee abuses the trustee's discretion is by acting outside the authority granted by the terms and conditions of the trust. *Filzen*, 252 Wis. at 326 ("So long as trustees act in good faith and from proper motives and within the bounds of a reasonable judgment *under the terms and conditions of the trust*, the court has no right to interfere." (emphasis added)); *see also* RESTATEMENT (THIRD) OF TRUSTS § 50(2) (AM. L. INST. 2003) ("The benefits to which a beneficiary of a discretionary interest is entitled, and what may constitute an abuse of discretion by the trustee, depend on the terms of the discretion, including the proper construction of any accompanying standards, and on the settlor's purposes in granting the discretionary power and in creating the trust.").[6]

¶25     To repeat, the terms of the Family Trust permit Ron and Troy to distribute funds from the principal of the trust only for the "health, support and maintenance" of Judith, having in mind "the standard of living to which she was accustomed" at the time of Ron Sr.'s death. This language is a common guide for trustees' discretionary powers and ordinarily means that the trustee may make distributions for only the beneficiary's accustomed living and health expenses:

> Without additional language suggesting a broader standard …, the terms "support" and "maintenance" do not normally encompass payments that are unrelated to support but merely contribute in other ways to a beneficiary's contentment or happiness. Thus, these terms do not authorize distributions to enlarge the beneficiary's personal estate or to enable the making of extraordinary gifts.
>
> ….

---

[6] Section 50 of the Restatement (Third) of Trusts is the most recent version of section 187 of the Restatement (First) of Trusts which was cited with approval by our supreme court in *La Bonde v. Weckesser*, 265 Wis. 641, 646, 62 N.W.2d 561 (1954).

> Similarly, without more, references to "health," "medical care," and the like in the terms of a discretionary power may be useful to inform beneficiary expectations or guide an inexperienced trustee, but presumptively they provide merely for health and medical benefits like those normally implied by a support standard.

RESTATEMENT (THIRD) OF TRUSTS § 50 cmts. d(2), d(3) (AM. L. INST. 2003); *see also* ***Dunkley v. Peoples Bank & Tr. Co.***, 728 F. Supp. 547, 551, 562-63 (W.D. Ark. 1989) (holding that trustee abused his discretion in distributing the trust's principal for beneficiary's "health," "support," and "welfare" because he distributed nearly all of the principal to the beneficiary to purchase a house).

¶26 Vicki does not assert in this court a basis in the record to support a conclusion that Troy's lump sum distribution to Judith—approximately $712,000—was related to Judith's health, support, or maintenance. Accordingly, we conclude that this distribution was "contrary to the terms and conditions of the trust" and, therefore, Troy acted outside the authority granted by the terms of the Family Trust when he made the distribution. *See **Filzen***, 252 Wis. at 326.

¶27 As a result, Ron was legally obligated as trustee to take reasonable steps to redress Troy's unauthorized distribution of funds from the Family Trust. *See* WIS. STAT. § 701.0812(1) ("A trustee shall take reasonable steps … to redress a breach of trust known to the trustee to have been committed by a trustee."). Because Ron was legally obligated as trustee to redress Troy's unauthorized distribution of funds, it necessarily follows that Ron was legally obligated to seek the return of those funds to the Family Trust. Therefore, we conclude that Ron

had no "right" or legal entitlement to receive proceeds from the sale of the Family Farm as part of Judith's settlement offer.[7]

¶28 For her part, Vicki first contends that Troy's distribution was not contrary to the language of the Family Trust because Troy distributed the funds for Judith's "new revocable living trust." Vicki's only evidentiary support for this assertion is a citation to part of the transcript of the hearing at the circuit court. However, nothing in that page of the record (or the exhibit mentioned on that page) mentions a revocable living trust. We have no duty to scour the record to support arguments unaccompanied by adequate record citation. *Roy v. St. Lukes Med. Ctr.*, 2007 WI App 218, ¶10 n.1, 305 Wis. 2d 658, 741 N.W.2d 256. Therefore, Vicki's assertion does not alter our conclusion that Troy's actions were contrary to the terms of the Trust.

¶29 Moreover, even if we would assume that Vicki's factual assertion is correct, this justification for Troy's distribution of funds still fails because it amounts to an enlargement of Judith's personal estate, and that justification is not reasonably related to Judith's health, support, or maintenance. *See* RESTATEMENT (THIRD) OF TRUSTS § 50 cmt. d(2) (AM. L. INST. 2003).

¶30 Second, Vicki argues that Troy's distribution was not contrary to the terms of the Family Trust because the trust terminated pursuant to WIS. STAT. § 701.0410(1). That statutory subpart provides, in pertinent part, that "a trust terminates to the extent the trust is revoked or expires pursuant to its terms, *no*

---

[7] We also note that Vicki does not appear to dispute the underlying premise of Ron's argument that, if Troy's distribution of funds to Judith was unauthorized, then Ron had no "right to receive" those funds.

*purpose of the trust remains to be achieved*, or the purposes of the trust have become unlawful or impossible to achieve." Sec. 701.0410(1) (emphasis added). The parties agree that one purpose of the Family Trust was to provide for Judith's health, support, and maintenance.[8] According to Vicki, this purpose no longer remained to be achieved after Troy distributed the entire principal of the trust to Judith. This argument fails for at least the following reasons. Troy's distribution of the entire principal to Judith does not justify the unauthorized nature of Troy's distribution. Essentially, Vicki is arguing that Troy's distribution of funds could never be contrary to the terms of the Family Trust because the mere act of distributing those funds—authorized or not—eliminates the terms of the trust and retroactively authorizes the distribution of those funds. We do not accept this circular and legally dubious argument. In addition, § 701.0410(1) is identical in all material respects to § 410(a) of the Uniform Trust Code.[9] The comment to this section explains that "[w]ithdrawal of the trust property is not an event terminating a trust. The trust remains in existence although the trustee has no duties to perform unless and until property is later contributed to the trust." UNIF. TR. CODE § 410, cmt. (UNIF. L. COMM'N 2004).[10] Consistent with this comment, we

---

[8] Vicki also argues that another purpose of the Family Trust was to avoid estate taxes and that this purpose no longer remained to be achieved because Congress increased the estate tax limits in 2020. Because our conclusion regarding the Family Trust's purpose of providing for Judith's health, support, and maintenance is dispositive, we need not address whether the Trust's purpose of avoiding estate taxes remained to be achieved. *See **Barrows***, 352 Wis. 2d 436, ¶9 ("An appellate court need not address every issue raised by the parties when one issue is dispositive.").

[9] Section 410(a) of the Uniform Trust Code provides, in pertinent part: "a trust terminates to the extent the trust is revoked or expires pursuant to its terms, no purpose of the trust remains to be achieved, or the purposes of the trust have become unlawful, contrary to public policy, or impossible to achieve."

[10] We may rely on comments to the Uniform Trust Code. WISCONSIN STAT. § 701.1203 states: "This chapter shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this chapter among states enacting it."

conclude that Troy's distribution of the entire principal did not eliminate the Family Trust's purpose of providing for Judith's health, support, and maintenance. Therefore, Vicki's argument does not affect our conclusion that Troy's distribution of funds to Judith was contrary to the terms of the Family Trust.

¶31     Third, Vicki argues that Troy's distribution was not contrary to the terms of the Family Trust because the cotrustees could have agreed to terminate the trust. According to Vicki, if Ron and Troy agreed to terminate the trust, then there would have been no barrier to Troy's distribution of funds to Judith, and Ron would have had the right to receive Judith's settlement offer. This argument fails because it is entirely hypothetical. Vicki points to no evidence in the record that Ron and Troy reached an agreement to terminate the Family Trust. In addition, a necessary premise of Vicki's contention relies on the application of WIS. STAT. § 701.0411(2)(a) which states: "A noncharitable irrevocable trust may be terminated upon consent of all of the beneficiaries if the court concludes that continuance of the trust is not necessary to achieve any material purpose of the trust." Vicki's argument fails because, consistent with the analysis above, the continuance of the Trust is necessary to achieve the material purpose of the trust to provide for Judith's health, support, and maintenance.

¶32     For those reasons, Troy was not authorized to distribute the principal of the Family Trust to Judith because the distribution was contrary to the terms of the trust. As explained above, Ron was legally obligated to redress Troy's breach of trust and seek the return of the funds to the Family Trust. *See* WIS. STAT. § 701.0812(1). Thus, because Judith's settlement offer was premised on Troy's unauthorized distribution of funds, Ron did not have a "right to receive" proceeds from the sale of the Family Farm by virtue of that settlement offer.

15

**CONCLUSION**

¶33     For the foregoing reasons, we reverse the order of the circuit court and remand to the circuit court with instructions to order Vicki to pay Section 71 payments due from August 18, 2021, as required by the PMSA, and for other relief consistent with this opinion.

*By the Court.*—Order reversed and cause remanded with directions.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.